BERRYMONT LAND COMPANY *v.* DAVIS CREEK LAND & COAL COMPANY *et al.*

(No. 6838)

Submitted February 18, 1931. Decided March 24, 1931.
(Rehearing denied June 9, 1931)

306

*James Damron,* United States Attorney and *Okey P. Keadle,* Assistant United States Attorney, and *C. M. Charest,* General Counsel, Bureau of Internal Revenue, and *Clarence E. Dawson,* Special Attorney, Bureau of Internal Revenue, for the United States.

*Payne, Minor & Bouchelle, Campbell & McClintic,* and *Price, Smith & Spilman,* for appellees.

MAXWELL, JUDGE:

.This is an appeal from a decree of the circuit court of Kanawha County affirming a decree of the common pleas court of said county denying the claim of the United States for income and excess profit taxes assessed against the Davis Creek Land & Coal Company, a corporation, for the year 1920.

In denying the claim of appellant the common pleas court overruled appellant's exceptions to the very clear and ably prepared report of Donald O. Blagg, commissioner in chancery, to whom the cause had been referred by the court under order of reference. The total amount for which appellant makes claim in this suit is $32,329.17, which is made up of two items as follows: $23,860.82 being balance of the original assessment made in 1921, and $8,468.35 being balance of an additional assessment made by the Commissioner of Internal Revenue in 1926 against the Davis Creek Company for the year 1920. These matters must be considered separately.

The question as to the first item is whether it is barred by the federal statute of limitations aplicable to such matters. The period of limitation within which the government may enforce an assessment lien is prescribed in section 278 (d) of the Revenue Act of 1926 as follows:

> "Where the assessment of any income, excess-profits, or war-profits tax imposed by this title or by prior Act of Congress has been made (whether before or after the enactment of this Act) within the statutory period of limitation properly applicable thereto, such tax may be collected by distraint or by a proceeding in court (begun before or after the enactment of this Act), but only if be-

gun (1) within six years after the assessment of
the tax, or (2) prior to the expiration of any
period for collection agreed upon in writing by
the Commissioner and the tax-payer.''

The original assessment of the item under discussion was
made September 16, 1921. This was within the time as pro-
vided by section 277 (a) (3) of the said Revenue Act. Five
years from the date of the taxpayer's return is fixed as the
period within which the assessment must be made.

This suit was instituted by the plaintiff, a judgment lien
creditor, February 9, 1927. An order of reference providing,
*inter alia,* for ascertainment of the claims of all lien creditors
was entered January 4, 1928. The government's claim was
filed February 23, 1928, before the commissioner in chancery
to whom the cause was referred as aforesaid. The period of
limitation expired six years after September 16, 1921, to-wit,
September 16, 1927. Was the government's claim filed in
time? It was, if the institution of the suit in February, 1927,
tolled the limitation statute; but if the statute was not thus
tolled and continued to run against the government until
the entry of the order of reference or the filing by the gov-
ernment of its claim before the commissioner in chancery
under the order of reference, then, in either of the latter
events, the claim was barred.

The rule for this jurisdiction pertinent to such situations
is succinctly stated in Volume 1, Barton's Chancery Practice
(3rd Ed.), page 41: ''But now it has been definitely de-
cided in both of the Virginias that the effect of a genuine
creditor's bill is to stay from the date of the suit, during its
pendency, the running of the statute of limitations as to those
debts brought into the suit and kept alive while it is still
pending. If the suit is not a general creditor's bill but only
made such by an order of reference the better opinion seems
to be that the statute ceased to operate only from the order.''
See also Hogg's Equity Principles, sec. 462; *Rowan* v. *Chen-
oweth,* 49, W. Va. 287, 290; *Laidley* v. *Kline,* 23 W. Va. 565;
*Jackson* v. *Hull,* 21 W. Va. 601; *Woodyard* v. *Posley,* 14 W.
Va. 211.

We must, therefore, determine what was the character of this suit. The bill is patently deficient. It asserts that the suit is on behalf of plaintiff and all other lien creditors of the Davis Creek Company, but, although several other alleged lien creditors are named in the bill, none of them are made parties thereto. The Davis Creek Company is the sole defendant. It is also averred upon information and belief "that the United States of America has a claim against the defendant herein for income tax amounting to thousands of dollars." There is no allegation within the requirement of section 7, chapter 139, Code 1923, that execution had been issued and returned "No property found;" nor is the making of such averment sought to be excused on the ground, likewise within said statute, that an execution had not issued on the complainant's judgment within two years subsequent to the date thereof. The prayer of the bill is for a special receiver to take charge of the defendant's properties; for an injunction to restrain the lien creditors of the defendant from taking any action on their claims against the defendant until further order of court; and for an order of reference to ascertain the real and personal property of the defendant and to fix and report the liens thereon and their proper priorities.

Though the bill is clearly bad on its face, the question of its insufficiency was not raised in the trial court. It is bad because of its failure of compliance with requirements of section, 7, chapter 139, Code 1923, in two respects, first, it does not make the necessary averments with reference to the issuance of execution, and second, it does not make the other lien creditors parties defendant. However, on the day that the bill was filed, February 9, 1927, the common pleas court entered a decree appointing a special receiver to take charge of the properties of the Davis Creek Company as prayed for in the bill, and further ordered "that all lien creditors, judgment creditors and execution creditors be and they are hereby restrained, enjoined and inhibited from taking further action by suit or otherwise against the defendant until the further order of this court." March 10, 1927, and again April 1, 1927, the government caused its claim for taxes

against the Davis Creek Company for 1920 to be filed with the special receiver. June 9, 1927, the United States District Attorney for the Southern District of West Virginia approved an order of the common pleas court directing the Kanawha National Bank of Charleston to pay to the special receiver the sum of $3,293.58, funds of the Davis Creek Company on deposit in said bank; and on the 13th day of the said month the said district attorney appeared in said common pleas court and waived any claim of the United States Government for taxes against said Davis Creek Company to the extent of certain labor claims which were reported by the special receiver. While it is true that the mere filing of the government's claim with the special receiver, as aforesaid, did not technically constitute "a proceeding in court" as contemplated by the federal statute above quoted, the said action of the government fully demonstrated the good faith of the government representatives in the matter. In the light of the two appearances of the government's attorney in June, 1927, he must, of course, be deemed to have been advised of the injunction order. And, therefore, though the government was not a party defendant to the suit and had not been served with notice of the injunction, the fact of the existence of the injunction must be deemed to have been thus brought home to it through its attorney. In such situation, therefore, by reason of the injunction, no representative of the government could safely have proceeded to enforce the government's lien by distraint, or to have instituted a proceeding in court for the purpose of collecting the government's claim. It would be very harsh indeed to hold that, although subject to the injunction and thereby precluded from taking any active steps to enforce its claim, it must at the same time be subjected to the running of the statute of limitations. It would be a too narrow position to say that the only possible manner in which the government could have preserved its claim would have been by filing a petition in the chancery suit presenting its claim and seeking to be made a party defendant to the suit. Though the bill is plainly defective on its face, it was treated by all parties concerned as a sufficient pleading for a lien creditors' suit. It must

still be given that significance; therefore, the running of the six-year limitation against the government must be deemed to have been tolled by the institution of the suit. The claim was erroneously disallowed.

In February, 1926, the Commissioner of Internal Revenue made a finding that there was a deficiency of $10,813.99 in the computation of tax reported by the Davis Creek Company in 1920 and notice of such finding was mailed to the said company. It then appearing to the Collector that the Davis Creek Company was entitled to a refund of $2,523.85 from taxes paid by said company in 1922, the latter amount was credited on the alleged deficiency for 1920, thus making the net amount claimed, $8,468.35. The commissioner in chancery recast the whole set up for 1920 and found that the true amount due the government from the Davis Creek Company for that year was less than the original assessment made by the government in 1921 predicated on the company's amended return for 1920 (found by the commissioner to be barred), and, therefore, that the deficiency assessment of 1926, as aforesaid, was not justified. This finding of the commissioner in chancery necessitates consideration of the several items of deduction from gross income, approved by him.

(a) Depreciation on railroad. $1,330.52.

The following statement with reference to the railroad is taken from the report of Commissioner Blagg: "It appears that early in 1917 Samuel Edwards, R. N. Snyder and H. C. Jones purchased from the Kanawha & Coal River Railway Company and the Black Band Coal & Coke Company all of the 'machinery, rails and equipment' belonging to both of said companies. The railway in question was several miles in length. The purchasers sold off some of the machinery and all the rail except about three miles thereof running from the coal mine later acquired by these parties to the main line of the Chesapeake & Ohio Railway. Later in the year the same parties organized the defendant company, turning in to it the residue of the machinery, rails and equipment for the stock of the company." The original cost of this property to

Edwards and his two associates was $50,000 of which they paid $15,000 in cash and executed their notes for $35,000. In its amended return for 1920 the Davis Creek Company listed this property as of the value of $119,482 and claimed thereon a 5% depreciation, $5,974.10. The special receiver and creditors other than the government now contend that the proof warrants a valuation of $85,233.50 for this property as evidenced by an inventory made at the time the property was acquired in 1917. The Commissioner of Internal Revenue testatively disallowed this item of invested capital as claimed by the taxpayer in its return for 1920, and refused to recede from his said disallowance. However, on submission of the case in this Court, it is conceded by the government that the taxpayer is entitled to a value of $15,000 on said property as invested capital, the said sum being the amount actually paid in cash by Edwards and his associates for the property. The commissioner in chancery deducted from the said inventory certain items of cost of grading which he considered as not properly included in the portion of the railroad that passed to the Davis Creek Company. The commissioner thus ascertained a net of $26,614.50 as the amount allowable for invested capital on account of the railroad property for the year 1920. We are of opinion that the Davis Creek Company, at the very least, was entitled to the benefit of the said amount as invested capital on account of the railroad. The propriety of depreciation on the basis of 5% is not challenged by the government. We, therefore, approve the commissioner's finding that the taxpayer was entitled to a depreciation of 5% on said sum of $26,614.50, being the sum of $1,330.72 as a deduction to be made from gross income for that year.

(b) Loss on abandoned mine. $4,234.72.

In 1918, the company purchased a tract of 128 acres of land at the price of $100 per acre. It opened a mine thereon and removed some coal therefrom but soon encountered a "fault" which for many months it tried to overcome but failed, and then abandoned the mine. The evidence is not entirely satisfactory as to just when this abandonment took place, but the commissioner found that it was in 1920 as claimed by the taxpayer, and we are of opinion that the evi-

dence warrants that finding. The cost of this abortive development was $4,234.72, as shown by the books of the company. The commissioner in chancery allowed this item as a deduction from gross income for 1920, under section 234 (a) (4), Revenue Act 1918, and we approve that finding. There is not presented here a question of abandonment of real estate owned in fee by the taxpayer, as argued on behalf of the government. The taxpayer claimed such additional deduction but the commissioner in chancery specifically disallowed it.

(c) Loss on bad debt. $15,616.58.

In the latter part of 1919 or early in 1920, the Davis Creek Company contracted with the Interstate Coal & Dock Company, a corporation, to sell to it all of its output of coal, and shipments were made in conformity with that contract through most of the year 1920. Towards the end of the year the Interstate Company became delinquent in payment for such shipments, and in consequence thereof the Davis Creek Company closed down its mines December 27, 1920, and made no further shipments to the Interstate Company except on January 4, 1921, it shipped four cars of coal which had been mined just prior to the closing of the mines on December 27th. The contract between the two companies had several months yet to run, but the Davis Creek Company took the risk of breaching the contract rather than continue shipments to a consignee that apparently had broken down financially. The amount due from the Interstate Company December 31, 1920, was $23,717.58, to which must be added the price of the said four cars shipped January 4, 1921, amounting to $1,490.70, making a total of $25,208.28. In January, 1921, the Davis Creek Company succeeded in making collection of the Interstate Company of $9,591.70, leaving a balance of $15,616.58. The Davis Creek Company claims the right to deduct this balance, $15,616.58, as a bad debt, from the gross income of 1920. The government denies the right of the taxpayer to this deduction.

Section 234 (a) (5), Revenue Act of 1918, provides for the deduction from gross income of ''Debts ascertained to be

worthless and charged off within the taxable year.'' The government bases its denial of the right of the Davis Creek Company to this deduction on the ground that the company did not within the taxable year ascertain the said amount claimed as a deduction to be worthless and did not charge the same off its books within that year. It is true, as appears from the record, that the books of the Davis Creek Company for 1920 were not in fact closed until near the middle of 1921. In its ''completed'' return in April, 1921, the company did not claim this deduction, and when it was first asserted, in ''amended'' return filed in June, the amount of the deduction claimed was incorrectly stated as $17,717.58. The secretary and treasurer of the Davis Creek Company testifies that he became satisfied in December, 1920, that the account of the Interstate Company was worthless, but that ''we had hopes they might pay something even if it was five or ten percent.'' (The fact is that after making the $9,591.70 credit in January, 1921, the Interstate Company went into bankruptcy and paid no dividends.) The commissioner in chancery discusses these matters in the following manner:

''The issue of fact, on the technical side, is very close, with persuasive circumstances either way. It seems to me, however, that the equity is fairly clear. The company is charged with the selling price of the coal shipped to the Interstate Company, as a part of its income for the year 1920. This very income it failed to receive, because the purchaser could not pay. In 1921 the company had a deficit. It is inequitable to charge the company with the sales price and refuse to credit it with the loss by reason of its inability to collect. It can of course be argued that the Government can not guarantee that accounts will be collected, but neither is it to be assumed that the company will knowingly sell its coal to an insolvent, not hoping to collect for it. I speak of this equitable view, because it has its weight in arriving at a conclusion upon the disputed facts.

The contention of the Government is supported by the long delay in the actual closing of the books, by the fact that a shipment was made to the Interstate Company in January, and a collection made on account as well as a trade acceptance taken and used,.

and by the fact that only the residue of the account in question was charged off in the end, not the whole amount which is asserted to have been worthless.

On the other hand, the company is shown by its acts to have been so doubtful, at least, of the solvency of the Interstate Company in December, 1920, that it took the drastic course of closing down its operations and violating its contract by refusing to make further shipments. This was before the close of 1920. I would not give much weight to the fact that the four cars were shipped in January, because these cars were already loaded and something must be done with them. The market was declining, and it may well have been the only possible course open to the company. There is positive oral evidence that the company believed the account to be worthless, in a practical sense, in December. The hope of a small dividend sometime in the future is not inconsistent with such a belief. The fact is that the account was not wholly worthless, but the amount actually charged off was worthless. Had the entry been made on December 31, 1920, no doubt the whole amount would have been charged off; I so understand the testimony. The actual closing of the books, however, was delayed, and in the meantime a payment was received. When the closing entry was made it was of course proper to modify the charge-off to this extent. I do not think there was such delay in the closing of the books in this instance as to evidence fraud in any sense. It is only to be considered as bearing upon the question whether an actual determination of worthlessness had been made within the tax year. * * *

Upon a consideration of the facts, I am of opinion that the company ascertained this debt to be worthless and charged it off within the tax year, and is entitled to deduct the amount thereof, $15,516.58, from its taxable income for the year 1920.''

Apropos of the commissioner's said finding, it is urged on behalf of the government that the result reached is predicated on what the commissioner considered to be the equity of the case rather than upon the law. We are of opinion that it is founded on both equity and the law, and that justice has resulted. The above quoted enactment of Congress re-

quiring that a debt, to be deductible from gross income for a given year, must be ascertained to be worthless and charged off within that year, does not by the terminology used have primary reference to the physical act of writing an account off the books. It is the fact of the worthlessness of the account, ascertained by the taxpayer within the year, with which the government is concerned. In *Jones* v. *Commissioner of Internal Revenue,* 38 Fed. (2d) 550, the court quotes approvingly a statement on this proposition which had been made by the Board of Tax Appeals in another case, as follows: "The mechanical process of keeping accounts is not prescribed by statute. Such accounts may be recorded in an elaborate set of books, or in mere memoranda, or be recorded only in the brain of the taxpayer. It can make no difference as to the form of such operation." In Klein, Federal Income Taxation, page 581, the author thus quotes from the Board of Tax Appeals: "Books of accounts are intended to reflect the true condition of the taxpayer's affairs and to assist the government in ascertaining true net income for taxation. When they do not do so, they should bind neither the government nor the taxpayer." The taxpayer may have elaborate books or he may have none, but in either event, if he contracts a bad debt and ascertains and recognizes that fact before the end of the taxable year, he is entitled to deduction of the same as of that year. The government of the United States is not concerned in collecting tax on income which has not in fact been received or cannot be collected. The argument on behalf of the government that if the Davis Creek Company was entitled to deduction on account of the bad debt under discussion, that deduction should properly have been made in 1921 instead of 1920, is not well taken in the light of the evidence that the debt was ascertained to be bad before the end of the year 1920. In addition to the testimony of the secretary and treasurer with reference to this proposition we have the outstanding fact of the very drastic action of the taxpayer in closing its mine in December, 1920, because of the apparent financial breakdown of the Interstate Company to which the Davis Creek Company had contracted to ship all of its output. This seems vividly to

demonstrate the fact of ascertainment of a bad debt. The book entries were not in fact made for some months thereafter, but they were made before the books were finally closed for the year 1920. Should the fact that the taxpayer succeeded in making a substantial collection on this debt in the early part of 1921 place any bar upon its successfully claiming as a deduction the difference between the amount so collected and the full amount of the debt as it stood at the end of 1920, and which was at that time deemed to be wholly bad, save possibly for the hope that was entertained by officers of the taxpayer that a small amount might be realized at a later date? The common sense of the proposition is that it should not. We find sound reasoning in the case of *Sawyer Tanning Company* v. *O'Keefe Shoe Company*, 23 Fed. (2d) 717. There a debt of $183,000 was charged off in 1920 as a loss for that year. $130,000 was collected on the debt in 1927. The court said: "The government was not obliged, in assessing it taxes, to await the final determination of the controversy; but where the settlement of the tax has remained in abeyance until the value of the claim has been established, I see no sufficient reason why that fact should not be recognized and the receiver instructed accordingly. When the just result in a commercial affair is plainly evident, courts ought to recognize it, unless prevented by rules of law, which, in the interest of broader justice, make that course impossible. The value of the claim in 1920 was $130,000, payable seven years later, a present worth of about $100,000. The Shoe Company's books may be surcharged to that amount and the tax computed accordingly." We think that in the case at bar the trial court and the circuit court were right in approving the commissioner's finding wherein he allowed to the taxpayer a deduction of the Interstate Company debt, less the amount which was credited thereon in the early part of 1921.

(d) Additional labor costs. $5,571.89.

The commissioner in chancery allowed this as a deduction from taxable income for 1920.

The Commissioner of Internal Revenue, in making the addi-

tional assessment in 1926, disallowed as a deduction the sum of $5,571.89 paid by the company to its employees in 1920, on the ground that it represented an increase in wages which had been assumed by the Interstate Company under its contract with the Davis Creek Company for the purchase of the latter's coal output. It is insisted on behalf of appellees that it does not satisfactorily appear from the record that there was in the contract between the Davis Creek Company and the Interstate Company a provision that the purchasing company should pay a sufficiently increased price for the coal to absorb any necessary advance in wages by the Davis Creek Company to its employees. For purposes of discussion, however, we will assume that such provision was embraced in the contract between the two companies. For the appellant it is said: "The government does not deny that the taxpayer should have a deduction for this item if the amount of the item is included in its gross income, but since it was not included in its gross income, it is clear that the Commissioner of Internal Revenue was correct in eliminating it from its labor costs. The same result would have been obtained if the Commissioner of Internal Revenue had added the amount of this item to the gross income reported by the taxpayer and permitted the amount to remain in the taxpayer's deduction for labor costs, but it was eliminated from labor costs without being added to gross income because it was the simplest method of auditing the taxpayer's return." The government's proposition of thus disposing of this item by eliminating it from both sides of the ledger does not meet the situation because the item represents an increased burden of the taxpayer regardless of whether the coal was sold or not, and if sold, whether it was ever paid for or not. If the amount of this item had been added to the amount due from the Interstate Company to the Davis Creek Company, it would simply have constituted that much more bad debt which the latter company would have been entitled to deduct from its gross income for 1920. The government is therefore none the loser by reason of the amount of this item being claimed by the taxpayer as an additional operating cost. We, therefore, approve the finding of the commissioner in allow-

ing this item to be deducted as a part of operating expense for 1920.

(e) Depreciation on steel rails. $199.22.

With reference to this item the commissioner says:

"The value of the steel rail in the mine of the company is valued at $3,984.48, and upon this amount the Commissioner of Internal Revenue allowed depreciation of five per cent. The testimony in the case shows that by reason of the character of the water in this mine the depreciation should be ten per cent. This does not apply to the rail contained in the railroad, outside the mine. I am of opinion that ten per cent depreciation should be allowed on this item, which amounts to $199.22 in addition to the allowance made by the Commissioner."

The government predicates no error upon this finding.

Thus, we approve all the deductions from gross income allowed by the commissioner in chancery; but we disapprove, as first herein discussed, his finding that the 1921 assessment is barred by limitation imposed by section 278 (d), Revenue Act 1926.

Therefore, the decree of the circuit court of Kanawha County which held that the decree of the common pleas court in denying all claim of the government of the United States for income taxes from the Davis Creek Land & Coal Company for 1920 was plainly right, is reversed; likewise the said decree of the common pleas court in so far as it affected the government's claim; and the cause is remanded to the circuit court for further proceedings in accordance herewith.

*Reversed and remanded.*