### SHERMAN & BRYAN, Inc., v. BLAIR, Commissioner of Internal Revenue.

Circuit Court of Appeals, Second Circuit.
July 22, 1929.

No. 210.

714

Earl B. Barnes, of New York City, and R. S. Doyle and John Enrietto, both of Washington, D. C. (Hopkins, Starr, Hopkins & Hamel, of Washington, D. C., of counsel), for petitioner.

Mabel Walker Willebrandt, Asst. Atty. Gen., and Sewall Key and John Vaughan Groner, Sp. Asst. Attys. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of New York City, of counsel), for respondent.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge. The questions presented involve the construction of section 234(a) of the Revenue Act of 1918 (40 Stat. 1077). This section declares that in computing the net income of a corporation there shall be allowed as deductions from gross income:

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise;

"(5) Debts ascertained to be worthless and charged off within the taxable year. * * * *"

The taxing officials have taken the position that the foregoing clauses are mutually exclusive, and that clause (5) relates to debts wholly worthless, so that in the case of debts only partially worthless no deduction whatever may be taken in the year when such partial worthlessness is ascertained. This is evidenced by article 151 of Regulations 69, which states:

"No deduction shall be allowed for the part of a debt ascertained to be worthless and charged off prior to January 1, 1921, unless and until the debt is ascertained to be worthless and is finally charged off or is charged down to a nominal amount, or the loss is determined in some manner by a closed and completed transaction."

This interpretation of the statute was accepted by the board in Appeal of Steele Cotton Mill Co., 1 B. T. A. 299, and has been followed in later decisions. See News Publishing Co. v. Commissioner, 6 B. T. A. 1257; Davidson Grocery Co. v. Commissioner, 9 B. T. A. 390. It was applied in the instant case, the board in its opinion stating that, while it was clear that the debt could not be collected in full, there was "not a preponderance of evidence that it was ascertained to be wholly worthless in 1920."

This conclusion is based upon a finding of fact that the records of the receiver as of September 30, 1920, as indicated by a statement of assets and liabilities which was subsequently prepared, showed available for general creditors, subject to payment of receivership expenses, assets of $205,940.88,

composed of $63,368.11 cash, and $142,572.77 due from the purchaser at the receiver's sale, the property having been sold in March 1920, for $290,000. A notation upon the statement showed that in December, 1920, $22,000 was allowed for master's fees, attorney's fees, and "first allowance to the receiver." Subtracting this item from the assets of $205,940.88 left $183,940.88, which the board concluded would be available for general creditors, whose filed claims amounted to $473,528.37. Because the purchaser at the receiver's sale was not shown to be insolvent, the board assumed that the $142,572.77 balance would be collected from him, although in September 1920, he was in default in payments, and the receiver then contemplated that it would probably be necessary to resell the property.

It is not clear how much of the foregoing information the board thought the taxpayer possessed in September, 1920, when the debt was charged off as worthless. There are findings that Mr. Sherman, president of the taxpayer, was familiar with the affairs of Fulton Motor Truck Company, and had knowledge of the nature of its assets and the extent of its liabilities at the time of the appointment of the receiver; that Sherman had been informed by the receiver that a resale of the property would probably have to be made because of the default in payment by the purchaser at the March sale; that Sherman estimated that preferred claims and expenses of the receivership would amount to $134,000, and claims of general creditors would total between $500,000 and $600,000; and that the indebtedness was charged off as bad, "based upon knowledge that the petitioner had received through Shepard (the receiver), its president, and other sources." But there is no finding that the taxpayer's opinion that the debt was worthless was an unreasonable conclusion from the knowledge it possessed, or was formed after an inadequate investigation of the affairs of the receivership, and the board's opinion leaves us in doubt as to the implications of the decision. Does it mean that no debt can, within the meaning of section 234 (a) (5) be "ascertained to be worthless," however reasonable the creditor's belief that it is, if in fact it appears later that some part of it was collectible, or does it mean merely that the taxpayer's belief in the instant case was an unreasonable conclusion from the facts known or ascertainable by an adequate investigation?

Mr. Sherman's testimony was to the effect that he had not seen the statement of the receiver's assets and liabilities made up as of September 30, nor were the figures used in that statement available to him. He had, however, talked with the receiver and his assistants, and had the impression that approximately $120,000 was on hand, but he believed that preferred claims and expenses would require $134,000. He knew that the purchaser at the receiver's sale was in default, and had been informed by the receiver that the assets would probably have to be resold. From such a resale Sherman apparently expected little to be realized for he testified that the original sale price of $290,000 was "a fabulous figure, being twice or more than was expected." He said he thought the claims of general creditors would amount to $500,000 or $600,000, and that Mr. McDermott, at that time the office manager and accountant of the taxpayer, had expressed the opinion that the account was worthless. McDermott was not quite so definite in his testimony, but said that on the general information he had of the affairs of the receivership in September, 1920, obtained from conferences with the receiver, Mr. Sherman, and various creditors, he believed the corporation was justified in writing off the account, and that he would do the same thing in his own business to-day under similar circumstances. No testimony was introduced by the respondent, the showing as to the actual condition of the receivership, as reflected in the above-mentioned statement of September 30, having been made by the petitioning taxpayer. It further appears that in 1921 a final distribution was made and the receivership closed, but the amount of this dividend to the petitioning taxpayer is not shown.

On this record we are asked by the taxpayer to rule that the whole indebtedness was ascertained to be worthless in September, 1920, and was reasonably so ascertained, and therefore was a proper deduction in the taxpayer's return for that year. The corollary, admitted by the taxpayer, is that the dividend received in 1921 should be treated as income of the year in which it was received. See United States v. S. S. White Dental Co., 274 U. S. 398, 400, 47 S. Ct. 598, 71 L. Ed. 1120. While we have no doubt of the bona fides of Mr. Sherman's belief that the debt was worthless, we are not convinced that he had ascertained it to be worthless, within the meaning of the statute. To ascertain is to make sure by investigation, and it is conceded that, to justify charging off a debt for tax purposes, the taxpayer must make a reasonable investigation of the facts and draw a reasonable inference from the information thus obtainable. Mr. Sherman's pessimistic view of the prospect of dividends from the

receivership was apparently influenced largely by two assumptions: One as to the expenses of the receivership; the other as to what would happen if the property had to be resold. He says he estimated expenses at $70,000, a figure reached by allowing $25,000 to the auctioneer, $25,000 to the receiver, $10,000 to the receiver's attorneys and $10,000 to the special master. He makes no showing of any information possessed by him which might justify such an exorbitant estimate, or of any attempt to corroborate its accuracy by inquiry from the receiver or others.

His other assumption seems to have been that if the purchaser failed to pay the balance due (believed by Mr. Sherman to be about $170,000) no substantial sum could be realized upon a resale of the property. He was justified in believing that a resale would probably be necessary, but we find no support for his belief that a resale would produce nothing for general creditors. It is true that he thought the original price more than twice what the property was worth, but if the resale should bring only $50,000 (and assuming that the $120,000 already in hand would no more than pay preferred claims and expenses) the general creditors would get a dividend of 10 per cent. While creditors are not required to be "incorrigible optimists," they may not be unduly pessimistic when claiming deductions for worthless debts. We are not satisfied that the petitioning taxpayer's determination that its debt was wholly worthless was a reasonable conclusion after adequate investigation. Consequently there was no error in refusing to allow a deduction of the full amount of the debt.

█ This brings us to the second question, the refusal to permit so much as is admittedly worthless to be deducted. The government contends that section 234(a) (5) does not permit the partial charge-off of a debt not wholly worthless. See Minnehaha National Bank v. Commissioner, 28 F.(2d) 763 (C. C. A. 8); Selden v. Heiner, 12 F.(2d) 474, 478 (D. C. W. D. Pa.). Further support for the argument is sought in the fact that in the Revenue Act of 1921 (42 Stat. 255, § 234(a) (5), Congress expressly gave permission for a partial charge-off of a debt recoverable only in part. But such subsequent legislation is not conclusive that the construction claimed for the earlier act must be accepted. See Russell v. United States, 278 U. S. 181, 188, 49 S. Ct. 121, 73 L. Ed. 255. "Debts ascertained to be worthless" might, it would seem, reasonably be construed to mean "indebtedness ascertained to be worthless," and to permit a charge-off of such part of a claim as was proven to be uncollectible by so definite an event as seizure of the debtor's property by a receiver. We do not, however, find it necessary to decide this point, because, if clause (5) does not permit the deduction, we think it may be made under clause (4). The taxpayer relies upon both clauses.

██ Here we are met by the respondent's argument that clause (4) cannot now be relied upon, because the taxpayer's petition to the Board of Tax Appeals did not specifically mention clause (4) as the basis for its claimed deduction, but referred only to clause (5). The former rules of the board required the parties to state in their pleadings the propositions of law upon which they relied. Upon the facts pleaded, the issue of law was the deductibility of the whole sum. It was thus stated in the Commissioner's answer: "A bad debt is not allowable as a deduction from gross income until the worthlessness of the debt has been ascertained."

Upon the facts proved, the issue of law became the deductibility of so much of the debt as was proved worthless. If an amendment of the pleadings had been thought necessary, it would undoubtedly have been permitted. Without any amendment the board considered the issue of law presented by the facts proven, for its opinion states: "An ascertainment that a debt is worthless only in part does not meet the requirements of the statute." The correctness of that ruling is raised by this appeal, and the court not only may, but must, consider all pertinent provisions of the statute.

█ The government urges that clauses (4) and (5) are mutually exclusive, so that, since clause (5) covers losses arising from worthless debts, clause (4) must cover only losses otherwise arising. But, since the argument assumes that clause (5) does not permit the charge-off of a debt partially bad, there would seem to be no inconsistency in allowing the partial loss as a deduction under clause (4), even if the two clauses be deemed mutually exclusive. However, it does not appear to have been authoritatively determined that they are mutually exclusive.

In Lewellyn v. Electric Reduction Co., 275 U. S. 243, 246, 48 S. Ct. 63, 64 (72 L. Ed. 262), Mr. Justice Stone said: "We assume without deciding, as was assumed by both courts below, that subsection (4) and subsection (5) are mutually exclusive, so that a loss deductible under one may not be deducted under the other." There the taxpayer had prepaid a seller for merchandise which was never delivered, the seller proving to be ir-

responsible. It was held that the buyer's contract rights were not a "debt," and that the loss suffered by reason of their being worthless 'was deductible under clause (4), but that the loss was not sustained in the year when the prepayment was made, but in a later year, when events proved the buyer's rights worthless.

Our own case of United States v. Klausner, 25 F.(2d) 608, 611, contains a dictum that a debt of doubtful value could not be deducted as a "loss." In Porter v. United States, 27 F.(2d) 882, 884 (C. C. A. 9), there is a similar dictum. In neither case was there any charge-off of the debt as worthless in whole or in part, nor had it become uncollectible by a receiver's seizure of the debtor's property. In United States v. S. S. White Dental Co., 274 U. S. 398, 47 S. Ct. 598, 71 L. Ed. 1120, the taxpayer carried on its books an investment in the capital stock of, and a debt owing by, its German subsidiary. When the property of the latter was seized by the German sequestrator, the taxpayer charged off its investment in the debt and the stock, and claimed a corresponding deduction in its 1918 return. This was disallowed by the Commissioner upon the ground that the loss was not evidenced by a closed and completed transaction. The Supreme Court held that the deduction was proper, and says that while the statute does not contemplate a deduction of losses resulting from the mere fluctuation in value of property owned by the taxpayer, it does contemplate the deduction of losses "which are fixed by identifiable events, such as the sale of property (articles 141, 144), or caused by its destruction or physical injury (articles 141, 142, 143), or, in the case of debts, by the occurrence of such events as prevent their collection (article 151)."

The seizure of the debtor's property by a receiver prevents collection, and definitely fixes the loss to be the difference between the face of the debt and whatever dividend the receivership may pay. The Commissioner's position leads to the conclusion that, if any dividend is likely, no loss can be deducted until the receivership is wound up, which may be many years later. Business men do not carry on their books at face value claims against a debtor in receivership, and it cannot be supposed that the Revenue Act of 1918 was intended to require them to do so. When a creditor's debtor goes into receivership, and the creditor believes the debt to be worthless and charges it off, he recognizes that he has sustained a loss at least to the extent that the receivership dividend which may thereafter be declared leaves the debt unpaid. Presumptively the taxpayer's decision that a debt is worthless, and so charged off, measures his loss. If the Commissioner surcharges his return because of a mistake as to the amount of the loss, we think he should not surcharge for so much of the loss as he admits has been suffered. No judicial decision has been found which contradicts this view. The only case closely analogous which has been discovered is Sawyer Tanning Co. v. C. J. O'Keefe Shoe Co., 23 F.(2d) 717 (D. C. Mass.). That tends to support our conclusion.

While it appears that some dividend was received in 1921, the amount of it is not shown. The argument has proceeded upon the assumption that it was more than a nominal amount, and may have been as much as 30 per cent. We think the case should be remanded for further evidence on this point, and that the taxpayer should be allowed a deduction of such sum as represents the uncollectible portion of its debt.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with the foregoing opinion.