KENTUCKY ROCK ASPHALT CO. v. HELBURN.

No. 1813.

District Court, W. D. Kentucky.

Aug. 28, 1937.

Gordon, Laurent, Ogden & Galphin, of Louisville, Ky., for plaintiff.

Robert H. Jackson, Asst. Atty. Gen., Andrew D. Sharpe and James E. Murphy, Sp. Assts. to Atty. Gen., and Bunk Gardner, U. S. Atty., of Louisville, Ky., for defendant.

HAMILTON, District Judge.

This is an action by the Kentucky Rock Asphalt Company against E. S. Helburn, former collector of internal revenue for the District of Kentucky, seeking to recover from him $24,000 income taxes and $2,746.51 interest thereon, collected pursuant to an assessment by the Commissioner of Internal Revenue made on an audit and review of the plaintiff's income tax return for the calendar year 1930.

The plaintiff timely filed its income tax return for the calendar year 1930 and deducted from gross income $200,000 bad debt, a sum alleged to be on deposit to the credit of the plaintiff in the Bank of Tennessee, which corporation, in a hopelessly insolvent condition, ceased to do business during the year and was placed for liquidation in the hands of the Banking Commissioner of Tennessee. The evidence shows conclusively that the Bank of Tennessee will pay nothing on plaintiff's claim.

The facts out of which this controversy arises are substantially as follows:

In 1926 Caldwell & Co., a Tennessee corporation, engaged in the investment and financial underwriting business, acquired the capital stock of the Kentucky Rock Asphalt Company, a Kentucky corporation, and immediately effected a reorganization of the company by creating a Delaware corporation of the same name to which all of the assets of the Kentucky, or old corporation, were transferred.

Under the reorganization, the officers and owners of the stock of Caldwell & Co. became the voting trustees under a voting trust for a majority of the stock of the plaintiff, and these same parties were the owners of all the capital stock of the Bank of Tennessee, which institution was operated solely for the convenience of Caldwell & Co., and was not a commercial bank in the ordinary sense.

In the reorganization of the asphalt company, $1,500,000 of its mortgage bonds were issued and sold to the public. On June 1, 1926, the asphalt company, through its board of directors, ostensibly, for the purpose of obtaining additional working capital, provided for the issue and sale of so-called 6 per cent. Gold Notes, payable on or before June 1, 1931. Two hundred of these notes of the par value of $1,000 each were apparently sold to Caldwell & Co. The transaction was consummated by the plaintiff forwarding the notes by registered mail to the bank of Tennessee with instructions to deliver them to the puchaser upon receipt of $200,000. The bank credited on its books $200,000 as a deposit to the plaintiff, charging Caldwell & Co. with an equal sum, and kept the notes.

On November 17, 1927, the board of directors of the asphalt company adopted a resolution reciting that the company had agreed at the time it sold the notes to Caldwell & Co. to repurchase them at Caldwell & Co.'s request, and that it could not keep this obligation. It was further recited in the resolution that Caldwell & Co. could resell the notes if the asphalt company agreed to redeem them above par and assume the burden of certain state and federal income taxes falling on the owners of the notes.

To meet the new conditions, the asphalt company specifically agreed as follows:

"(a) In the event any of said notes are called for payment prior to maturity, the redemption prices shall be, in addition to accrued interest: 103% of the principal amount from June 1, 1927, to and including November 30, 1928; 102-½% of the principal amount from December 1, 1928, to and including May 31, 1929; 102% of the principal amount from June 1, 1929, to and including November 30, 1929; 101-½% of the principal amount from December 1, 1929, to and including May 31, 1930; 101% of the principal amount from June 1, 1930, to and includ-

ing November 30, 1930, and 100-½% of the principal amount at any time after November 30, 1930, until maturity.

"(b) The Company, so long as any of said notes are outstanding, shall reimburse the holder, upon application made within sixty (60) days from date of payment or its due date, but without any penalty or interest thereon, normal Federal income tax not exceeding two (2%) per cent, Kentucky five (5) mills tax, or District of Columbia five (5) mills tax, or Maryland four and one-half (4½) mills tax, or the Massachusetts income tax not in excess of six (6%) per cent per annum, said reimbursement to be made through Caldwell and Company, under such terms and conditions as it may reasonably require.

"(c) The President or Vice-President and the Secretary or an Assistant Secretary shall stamp, print or impress on each of said notes a statement, in such form as counsel may advise, to the effect that the aforesaid premiums will be paid upon redemption and the aforesaid taxes will be reimbursed."

The conditions of the above resolution were not carried out by either the plaintiff or Caldwell & Co. The Bank of Tennessee continued to hold the notes and maintained the $200,000 deposit on its books to the plaintiff's credit.

Four per cent. was the usual rate of interest paid on time deposits by the Bank of Tennessee. It credited the asphalt company annually with 6 per cent. interest on its deposit, which in turn was credited as interest to Caldwell & Co. as owners of the bonds. The notes were not redeemed by the plaintiff before the bank closed, and the asphalt company did not check against or withdraw any part of the deposit.

Prior to the closing of the bank, probably in the calendar year 1930, Caldwell & Co. withdrew the $200,000 in notes and pledged them to some of its creditors. This was unknown to the plaintiff until November, 1930, after the closing of the bank.

Caldwell & Co. dominated the board of directors of the plaintiff and its deposit in the Bank of Tennessee was unused, although borrowing working capital each year.

The plaintiff carried on its books as an asset the $200,000 deposit, and the notes of an equal sum as a liability, until January or February, 1931. Immediately after the close of the year 1930, it published and sent to its stockholders a statement showing this fact. It made closing entries on its books

as of December 31, 1930, showing no change in either the deposits or notes. Outside auditors annually made examinations of the books of accounts of the plaintiff after the close of the year and made appropriate book entries of any changes resulting from the audit.

Under the prevailing practice, these auditors completed their work for the calendar year 1930 in January or February, 1931, and after a conference between them and officers of the company, proper entries were made on the books as of December 31, 1930, charging off as a bad debt the $200,000 deposited in the Bank of Tennessee. On March 16, 1931, the plaintiff filed with the collector of internal revenue its income tax return for the calendar year 1930 deducting from gross income the $200,000 as a bad debt.

On July 1, 1932, the plaintiff bought $43,000 par value of these notes from an Owensboro, Ky., bank for $11,180 and for that year reported in gross income $31,820, the difference between the par value and the purchase price of the notes, and showed no taxable income for that year. The remaining $157,000 of the notes were in the hands of the Fourth and First National Bank of Nashville, Tenn., as trustee for several owners, and the plaintiff, on September 9, 1935, agreed to pay these notes by depositing for a period of three years in the Commerce Union Bank at Nashville, Tenn., all sums received from the sale of asphalt in the state of Tennessee in excess of $5.33 per ton.

The Commissioner of Internal Revenue disallowed the bad debt deduction claimed for the year 1930 on the ground that the loss was not definitely ascertained until the year 1931.

The defendant here insists the deduction was not allowable for the following reasons:

(1) That the relationship of debtor and creditor did not exist between the plaintiff and the Bank of Tennessee by reason of the deposit and that the respective accounts between the plaintiff and the bank were mere bookkeeping entries which added nothing in fact to the assets of the plaintiff.

(2) That the loss sustained by the plaintiff arose from a breach of contract by Caldwell & Co. in disposing of the notes and no deductible loss from income was suffered by the plaintiff until it paid the notes.

(3) That the bad debt was not in fact charged off the books of the plaintiff during the calendar year 1930.

The statute here involved (Revenue Act 1928, § 23(j), 45 Stat. 799, 26 U.S.C.A., chapter 24, § 2023(j) [26 U.S.C.A. § 23 and note]), provides:

"In computing net income there shall be allowed as deductions: * * *

"(j) Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part."

▮ The interpretation of revenue statutes is not an exact science, but rather a practical art. The popular sense of words, not their strict legal meaning, should be used in applying the acts to transactions supposedly within the statutes.

In the case here, we have an unusual transaction. The three corporations involved were controlled and operated by identically the same persons. When all the facts are considered, it is a fair inference that the issue of the $200,000 in notes and the so-called deposit in the Bank of Tennessee were not for the benefit of the plaintiff or the Bank of Tennessee. It was a device by which Caldwell & Co. took from the depositors of the Bank of Tennessee $8,000 annually under the guise of interest on the bonds.

The credit of $203,035.34 to the asphalt company on the books of the Bank of Tennessee was first made September 3, 1926. It was not the proceeds of a check from Caldwell & Co. payable to either the bank or the asphalt company, but a charge made against Caldwell & Co. on the books of the bank and a credit to the asphalt company. Four per cent. of the interest credited on the deposit was charged to the bank and 2 per cent. to Caldwell & Co.

On July 27, 1928, the deposit account of the asphalt company was closed and the $200,000 transferred to Caldwell & Co. On July 30, 1928, these entries were reversed and Caldwell & Co. charged with $200,000, and the deposit account of the asphalt company reopened with a $200,000 credit. These entries, both charges and credits, were apparently made without the knowledge or consent of the asphalt company.

The word "debts" lends itself to many judicial definitions, but, as ordinarily understood, it means a definite promise to pay at some time. When a contract providing for payment is uncertain as to time or amount, it is not a debt, and so long as the sum to be paid depends on a contingency, it is not a debt until such contingency is removed. Liability is not a synonym for debt. A sum of money payable with certainty is a debt whether or not presently due.

[2] Each tax case turns on the facts peculiar to the transaction out of which it is claimed tax liability arises and rarely does one case control another. Form must yield to reality and where loss or gain is involved in testing liability under the income taxing statutes, courts will seek the substance and not the shadow. Generally speaking, the income tax law is concerned only with sustained losses and until the facts show, with a reasonable certainty, that a loss is actually sustained, no deduction is allowable.

If a merchant sells goods on credit, the promised payment becomes a part of his gross income and the failure of payment does not become a deductible item until it is reasonably known the debtor cannot and will not pay. If A gives to B his accommodation note, and B discounts it at a bank, A has not sustained a deductible loss from gross income until he has paid the note.

▮ The plaintiff sustained an ascertainable loss which did not arise out of the bank account, but from the notes. Plaintiff knew in 1930 that the notes, negotiable in form, were in the hands of innocent holders and it would be called on to pay them. There is no substantial evidence in the record as to whether plaintiff kept its books on a cash or accrual basis. It could have accrued the loss under an accrual system of accounting, but it claimed the deduction solely on the ground the bank account was the source of its loss and its refund claim is so based. Its action for refundment of taxes can be no broader than its refund claim. Looking at the substance of the transaction, in the light of the acts of the parties, I am led to the conclusion that the plaintiff delivered to Caldwell & Co. for sale $200,000 of its so-called Gold Notes, and Caldwell & Co. was not called on to pay for them until they had been sold, or otherwise disposed of by it. Pending this resale, or other disposition, plaintiff was obligated to repurchase the notes.

Plaintiff was out no cash, or equivalent, until it paid the notes or became obligated to pay them, when for the first time an ascertained loss would have occurred. The sum deposited in the Bank of Tennessee, while standing to the credit of the plaintiff,

was not subject to its control. This conclusion is inescapable unless we impute to Caldwell & Co. a fraud, as it drew on the account and used it for its own purpose. The plaintiff at no time attempted to exercise control over the account, made no withdrawals from it nor credits to it, and paid no interest on the bonds while they were held by the Bank of Tennessee.

The relationship of debtor and creditor did not exist between the plaintiff and the Bank of Tennessee as to the deposit. The credit on the books of the bank to the plaintiff was subject to the contingency that the plaintiff would repurchase the notes at the request of Caldwell & Co., unless they were resold by it, in which event the cash from the purchasers would be available to the plaintiff. Plaintiff had no authority in advance of the sale to check on or withdraw the deposit. Caldwell & Co. breached the contract during the calendar year 1930 by withdrawing the notes from the bank, which resulted in an ascertainable, but unpaid, loss to the plaintiff.

The plaintiff has introduced no evidence to explain the resolution of its board of directors of November 17, 1927, wherein it is stated that "Caldwell & Co. bought the notes upon the representation and understanding that same would be taken up at the request of Caldwell & Co.," nor has it introduced any evidence to explain the transfer of the deposit of Caldwell & Co. on the books of the bank July 27, 1928, and the retransfer to the plaintiff July 30, 1928. The transcript of the general ledger of the Bank of Tennessee, Exhibit B, shows that Caldwell & Co., on July 21, 1928, drew checks on this deposit in the Bank of Tennessee, which strongly indicates that Caldwell & Co. controlled the deposit to the exclusion of the plaintiff.

The deposit and the notes were so closely merged as to prevent a reasoning mind from separating them into two transactions, making the deposit the absolute property of the plaintiff and divesting it of title to the notes. Before a bad debt can arise, the taxpayer must first have advanced cash or its equivalent and failed to recover all or part of his investment. The mere giving of a note could never result in a bad debt to the maker and where the proceeds of a sold or discounted note are to remain escrowed, or its use restricted under a repurchase or similar agreement, the relationship of debtor and creditor does not exist in such way as to create a bad debt. The reason for this is readily apparent, as the retained money always offsets the note.

The defendant's contention that the bank deposit, if belonging to the plaintiff, was not an allowable bad debt deduction because not charged off within the calendar year is without merit. The physical entry on the books of the plaintiff charging off the $200,000 as a bad debt was not made until February, 1931, but its worthlessness was determined during the calendar year 1930.

The plaintiff had closed its books for the year and issued a statement to its stockholders, corresponding to its books, without charging off the $200,000. Immediately after the close of the year, and before its income tax return was filed, the auditors employed by the company, following its customary practice, made an examination of the accounts of the plaintiff and pursuant to their instruction, after conference with the officers of the plaintiff, the charge off was made.

As I have heretofore stated, the administration of the income tax revenue statute is concerned with practical things, and it is hardly feasible for the officers of a corporation to immediately determine at the close of the year deductible bad debts. While the language used in the act provides that the ascertained bad debts shall be "charged off within the taxable year," it is not to be presumed that the Congress intended this language to mean all entries on the books of a corporation should be made and the books closed at midnight of the day the taxable year ended. As a practical matter, many facts are assembled as a basis for the book entries after the close of the year, and the Congress did not intend there should be an essential departure from the usual course of business in making book entries in order to comply with the income tax laws.

If the officers of the corporation before the close of the year had within their knowledge facts showing the debt to be bad, and within a reasonable time after the close of the year, before an income tax return was due, entries were made on the books showing the charge off, the provisions of the statute would be met. This rule would not permit tax evasion, nor require the taxpayer to resort to any unusual hardship in keeping his books. The facts show a substantial compliance by the plaintiff in charging off the alleged bad debt.

██ As a part of its evidence, the defendant tendered a duly authenticated copy of the record of the chancery court of Davidson county, Tenn., in the case of Commerce Union Bank v. Kentucky Rock Asphalt Company. This was an action instituted by the Commerce Union Bank against the asphalt company, seeking to recover from it $94,760 on a part of the notes claimed as a bad debt in this action.

The defendant filed an unverified answer in the Tennessee case in which it alleged as a defense that the notes were not executed in good faith and the deposit in the Bank of Tennessee to the credit of the asphalt company was a mere bookkeeping entry. It further alleged as a defense it had received no consideration for the notes. In that action W. H. Tarvin, then president of the plaintiff, testified by deposition, among other things, that the pretended sale of the notes to Caldwell & Co. was in form only. He said there was to be a deposit to the credit of the Kentucky Rock Asphalt Company in the Bank of Tennessee and the bank was to carry the notes as an offset until the asphalt company needed the money, at which time the notes would be paid. He said as he understood the transaction it was no more than a bookkeeping entry. He stated the deposit was not subject to check of the asphalt company. He also testified the matter was discussed with the vice president of Caldwell & Co., who stated the Rock Asphalt Company would be credited with 6 per cent. interest and the coupons would be sent to the asphalt company as an offset, and that up to the time of the failure of Caldwell & Co. and the Bank of Tennessee in November, 1930, the asphalt company paid no interest, but received the clipped coupons every six months. The defendant contends that this is substantive evidence in the case at bar.

It has been held in some cases that a party is bound by admissions contained in a pleading prepared by his attorney, but I believe the fairer rule to be that a party is bound only by verified statements contained in a pleading in another case. Estoppel should be cautiously applied in every case, as it often becomes a barrier to the truth. The answer filed by the defendant in the Tennessee case is not competent evidence here. Delaware County v. Diebold Safe & Lock Co., 133 U.S. 473, 495, 10 S.Ct. 399, 33 L.Ed. 674; Combs v. Hodge, 21 How.(62 U.S.) 397, 408, 16 L.Ed. 115; Creal v. Gallup

(C.C.A.) 231 F. 96, 101; Fidelity & Deposit Co. v. Redfield (C.C.A.) 7 F.(2d) 800, 804.

██ The statements made by W. H. Tarvin, plaintiff's president, in the Tennessee case, are only admissible for the purpose of affecting his credibility as a witness. Sturm v. Boker, 150 U.S. 312, 342, 14 S.Ct. 99, 37 L. Ed. 1093.

Plaintiff's petition will be dismissed and defendant will recover his cost. Counsel will prepare findings of fact and conclusions of law conformable to this opinion.