H. Rodney Sharp, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Isabella du Pont Sharp, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 84259, 84260, 86704, 86705. Promulgated July 26, 1938.

*James S. Y. Ivins, Esq.*, and *Richard B. Barker, Esq.*, for the petitioners.

*Dean P. Kimball, Esq.*, and *A. T. Akin, Esq.*, for the respondent.

**OPINION.**

HILL: Petitioners' first assignment of error relates to the action of respondent in denying deductions to the extent of $140,412.13 claimed by them on account of capital net losses alleged to have been sustained during the taxable years in the circumstances set out in our findings of fact hereinabove. This issue is involved in all four of the consolidated proceedings.

Because of the fact that petitioners are husband and wife, and each purchased on the same date and at the same market price substantially the same securities sold by the other spouse at less than cost basis in order to claim a deductible loss for tax purposes, and after 30 days the securities were resold and in some instances reacquired by the original owner, respondent contends that the transactions did not constitute bona fide sales, and therefore the alleged losses are not allowable deductions.

Petitioners readily admit that the purpose of these transactions was to reduce their income taxes. However, such purpose does not defeat allowance of the deductions claimed, if bona fide sales were made and actual losses sustained. *Gregory* v. *Helvering*, 293 U. S. 465.

Respondent suggests that transactions between a husband and wife are to be subject to the closest scrutiny, citing *Frederick H. Hoffman*, 3 B. T. A. 964; *James L. Robertson*, 20 B. T. A. 112; *Slayton* v. *Commissioner*, 76 Fed. (2d) 497; *John E. Zimmermann*, 36 B. T. A. 279. While this is true, it does not mean that any different or harsher rule is to be applied in the instant case than would be applicable if the transactions had occurred between parties other than husband and wife. In substance, the question presented here is whether the stock transactions above set forth constituted bona fide sales, or whether they were merely sham or pretended sales entered into for the sole

174

purpose of reducing tax liability through the medium of the claimed loss deductions.

Where the result of a transaction is to restore the *status quo ante* under circumstances indicating that the taxpayer never intended to make a bona fide sale, the Board has consistently denied the deduction of alleged losses, whether or not the transaction was between husband and wife.

In *Mrs. Niels (Mellie) Esperson, Executrix*, 13 B. T. A. 596; affd., 49 Fed. (2d) 259; certiorari denied, 284 U. S. 658, cited by respondent on brief, the facts show that in October 1921, prior to his death, Niels Esperson sold through a broker certain shares of stock, and caused the broker to purchase on the same date and at the same price a like number of shares of the same stock ostensibly for his secretary and brother-in-law, to whom Esperson loaned the money to pay for the stock. The stock certificates were endorsed and turned over to Esperson as collateral security for the alleged loan. In 1923, after Esperson's death, the charges against his secretary and brother-in-law were canceled. The Board held there was no bona fide sale by Esperson; that he attempted to create a deductible loss and at the same time retain his stock.

In *Harold F. Seymour*, 27 B. T. A. 403, also cited in respondent's brief, the taxpayer, on December 30, 1927, purportedly sold for $50 to a close business associate 500 shares of corporate stock, which he repurchased from his associate on April 6, 1928, for $50. On December 27, 1928, the petitioner again purported to make a sale of 500 shares of stock of the same corporation to the same business associate for $50, and repurchased the stock in April 1929 at the same price. The Board denied the deductions claimed on account of alleged losses resulting from such transactions.

In *Sydney M. Shoenberg*, 30 B. T. A. 659; affd., 77 Fed. (2d) 446; certiorari denied, 296 U. S. 586, cited by respondent, the taxpayer gave instructions to a broker to sell certain personally owned stocks and at the same time instructed the broker to buy identical quantities of the same stocks on behalf of a corporation of which petitioner was president and in complete control. Upon the expiration of 30 days the corporation transferred the stocks to petitioner in his personal capacity. On the evidence, the Board concluded that the corporation was for all practical purposes an *alter ego* of the taxpayer, being entirely dominated by him; and since the whole transaction showed a persisting intention by the taxpayer to hold title and dominion over the stocks, it did not amount to a bona fide sale.

The present proceedings, in our opinion, are clearly distinguishable from the cited cases. Here there were no direct sales between the petitioners; all sales and purchases were made through a broker at

prices which represented the fair market value of the securities sold or purchased. The proceeds of each sale were deposited in the separate bank account of the seller, and there has been no transfer of funds or cash from either petitioner to the other. Each petitioner had sufficient separate cash funds on deposit to pay for all stocks purchased, and all stocks purchased were paid for in cash out of the bank account of the respective purchasers. At the time of the transactions there was no agreement between petitioners, express or implied, for the resale or reacquisition of any of the stocks involved.

The *status quo ante* of petitioners was not restored after consummation of the transactions in controversy, either in respect of their financial positions or the securities held by them. On December 19, 1932, petitioner H. Rodney Sharp sold thirteen items of securities, of which six items were never repurchased by him. On December 20, 1932, the same petitioner sold two items of securities, one of which was never repurchased. Of the securities sold by the husband on December 19, 1932, the wife purchased eleven items of like securities, but did not purchase either item sold by the husband on December 20. Of the securities purchased by the wife on December 19, 1932, three of the items were not thereafter sold by her but were retained in her portfolio. Likewise, the securities originally held and sold by the wife were not all purchased by the husband, and such securities as were sold by the one spouse and purchased by the other, were not all resold by the purchasing spouse upon the expiration of 30 days, but such resales as were made occurred during periods extending from slightly more than 30 days to more than 6 months after purchase, during which intervening periods there were substantial changes in the market values of the securities. Thus, the stocks owned and held by the petitioners, respectively, prior and subsequent to the transactions in controversy, were materially different. Nor did their financial positions remain unchanged. This is apparent from an examination of the schedule of sales and purchases set out in our findings of fact above. Reference to a single item will illustrate this point sufficiently. On December 19, 1932, Mrs. Sharp sold 70 shares of B. & O. common for $654.15, and on the same date her husband purchased the same number of shares of the same stock for $670.31. He sold this stock on June 21, 1933, for $1,578.85, thus realizing a profit in excess of $900 on his investment of $670.31, and on the same date Mrs. Sharp repurchased at a cost of $1,601.31.

In the light of the facts above set forth, we can not say that the transactions in question were not bona fide sales, merely because one petitioner saw fit to purchase at market prices with his or her separate funds securities similar to those sold by the other, or because at some later date a portion of the securities so sold was reacquired by the

original seller at market with separate funds, where there is no evidence of any agreement so to reacquire. To hold otherwise would be to deny ownership by petitioners of their separate funds and properties, since unrestricted control and dominion is a primary indicium of ownership.

On the first issue respondent's action is reversed.

The second issue involves a bad debt deduction claimed in his return for the year 1932 by petitioner H. Rodney Sharp in the amount of $80,602.17, which was disallowed by respondent. Briefly summarized, the facts relating to this issue show that one de Vaux and petitioner had been very good friends for about 20 years prior to the taxable year. De Vaux operated a small interior decorating business in New York, and also speculated in the stock market. He had little or no assets other than his equity in certain securities he was carrying on margin. In 1929 de Vaux requested petitioner to guarantee his account with the brokers, which petitioner did by posting collateral. In the spring of 1930 the market went up and petitioner was released from his guarantee and his collateral was returned to him. Later in the same year de Vaux's brokerage account again became undermargined, and petitioner again guaranteed the account by posting collateral. As the market declined petitioner put up additional collateral from time to time. Finally petitioner caused the account to be closed out in the spring of 1932, at which time pursuant to his guarantee petitioner paid de Vauv's indebtedness to the brokers in the amount of $104,286.75 and took over his securities at their market value of $23,684.58. The difference of $80,602.17 petitioner set up on his books as a debt owing to him from de Vaux and wrote off the amount as worthless. That the indebtedness was then in fact worthless is not in question here.

Respondent asserts that the deduction claimed is not allowable for two reasons. First, he says that the relationship of debtor and creditor never arose between de Vaux and petitioner; that the transaction constituted a gift of the amount in controversy by petitioner to his old friend, de Vaux. Without repeating the detailed circumstances set out in our findings of fact, it is sufficient to say that we have carefully considered all of the evidence and find nothing to indicate a donative intent on the part of petitioner.

Respondent's second contention is that, if a debtor-creditor relationship ever existed between the parties, the obligation was worthless at the time it arose, which respondent says was prior to the taxable year. Apparently respondent proceeds upon the theory that if de Vaux became indebted to petitioner at all, it was in 1930 when the petitioner guaranteed his friend's brokerage account. We think this view is erroneous. Petitioner at that time assumed only a sec-

ondary liability. If the market had advanced instead of declined, petitioner's guarantee again would have been canceled and his collateral released, as it was in the first instance, and if the account had then been closed de Vaux would never have become indebted to petitioner in that connection in any amount.

We think it is plain, under the facts of this case, that de Vaux did not become indebted to petitioner until 1932, when petitioner paid de Vaux's obligations to the brokers by reason of the guarantee given in 1930. Petitioner's agreement was to guarantee the account with the brokers; it was not an agreement to indemnify the brokers. Having paid de Vaux's indebtedness to the brokers pursuant to such guarantee, petitioner thereupon became subrogated to the claim of the brokers against de Vaux, and, this claim being worthless at that time, petitioner is entitled to the deduction claimed. See *Whitcher* v. *Welch*, 22 Fed. Supp. 763, and authorities cited.

On the second issue, respondent's action is reversed.

*Judgments will be entered under Rule 50.*