**HAMLEN et al. v. WELCH, Former Collector.**

**No. 3611.**

Circuit Court of Appeals, First Circuit.

Dec. 30, 1940.

Richard W. Hale, of Boston, Mass. (George C. Abernathy, Jr., and Hale & Dorr, all of Boston, Mass., on the brief), for appellants.

Loring W. Post, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., J. Louis Monarch and Julian G. Gibbs, Sp. Assts. to Atty. Gen., and Edmund J. Brandon and C. Keefe Hurley, both of Boston, Mass., on the brief), for appellee.

Before MAGRUDER and MAHONEY, Circuit Judges, and PETERS, District Judge.

MAHONEY, Circuit Judge.

This action was brought in the United States District Court for the District of Massachusetts to recover back income taxes for the year 1935, and is here on appeal from judgment for the defendant upon a directed verdict. The taxpayer died after suit had been commenced and his administrators with the will annexed have been substituted for him as parties plaintiff.

In his 1935 return, the taxpayer claimed as a deduction the sum of $38,875.70, which he had paid in that year to the Boston Safe Deposit & Trust Company and the Warren Institution for Savings, holders of mortgages on properties of the Nathaniel Hamlen Trust, of which the taxpayer was a trustee and one-fourth beneficiary. The money so paid was applied by the banks to the payment of taxes on these properties. The Commissioner of Internal Revenue disallowed the deduction and determined a deficiency, with interest, of $9,793.60. The claim for refund as to this part of his taxes was disallowed and suit brought.

The question to be determined is whether this was a bad debt "ascertained to be worthless and charged off within the taxable year" within the meaning of Section 23(k) of the Revenue Act of 1934[1], 48 Stat. 680, 689, 26 U.S.C.A.Int.Rev.Acts, page 673.

The case was heard on a stipulation of facts and oral testimony. The evidence

---

[1] "(k) Bad Debts. Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

shows that the Nathaniel Hamlen Trust was created under the will of the taxpayer's grandfather, and included many pieces of real estate in Boston. Several mortgages on real estate of the trust were held by the Boston Safe Deposit & Trust Company and the Warren Institution for Savings. The taxpayer and the other three parties in interest became owners of the assets of the William Powell Perkins Trust in 1929, and placed them in the Hamlen Trust in the same proportion as they were interested in them. Included in these assets was certain real estate in Boston which had been mortgaged in 1913 by William J. Stober to the Boston Safe Deposit & Trust Company to secure the payment of a promissory note for $225,000. In this mortgage, the mortgagor covenanted to pay promptly when due all taxes and assessments, as well as interest and principal.

On August 5, 1930, the taxpayer, as trustee under the will of Nathaniel Hamlen, and the Boston Safe Deposit & Trust Company signed an indenture whereby the Trust Company agreed not to demand payment of the principal sum secured by the mortgage until January 31, 1931, upon payment by Paul M. Hamlen, Trustee (the taxpayer), of interest from March 31, 1930, to January 31, 1931, and the taxpayer covenanted to pay the mortgage debt. By a written instrument of August 11, 1930, the taxpayer, in consideration of the extension, personally guaranteed to the Trust Company the payment of the principal and interest of said mortgage note for $225,000, in accordance with the terms of the extension.

Under date of October 17, 1930, the taxpayer signed a mortgage and note as Trustee under the will of Nathaniel Hamlen, which was secured by certain other trust property. The note was for the period of three years and payable to the Warren Institution for Savings, or its order.

The taxpayer seeks to deduct as a bad debt the amount paid by him in 1935 to the banks and applied by them to the payment of taxes on the properties covered by these mortgages. Between the giving of his guarantee and the payment to the banks, the financial situation with reference to the trust estate had become very bad. At the end of 1935 the Nathaniel Hamlen Trust had no net value.

On August 8, 1935, the taxpayer paid from his own funds, and not as trustee, to the Boston Safe Deposit & Trust Company the sum of $18,562.50 and on December 31, 1935, the sum of $10,000. On December 31, 1935, he paid from his own funds, and not as trustee, to the Warren Institution for Savings, the sum of $10,313.20. These sums total $38,875.70 and are shown to have been applied by the banks to the payment of taxes on the properties mortgaged to them. It appears that these payments by Mr. Hamlen were in part performance of his contractual obligations to the respective banks, as previously set forth.

Entries of these cash payments were made currently in the taxpayer's personal cash book. They were not considered as charging off these amounts as bad debts but as evidence of cash payments to the banks. Later these entries were posted in the ledger to the account of "Paul M. Hamlen, Guarantor", and were also posted to the profit and loss account through the journal in the closing entries. These entries in the journal and ledger were made as of December 31, 1935, though their physical entry on the books was made some time in February or the latter part of January, 1936.

There are in evidence two affidavits by the taxpayer containing valuations of the assets of the Nathaniel Hamlen Trust, which show that the taxpayer appraised the trust properties on November 29, 1935, at less than $1,000,000. This evidence, corroborated by expert real estate appraisers, and taken in conjunction with the balance sheet of the trust for 1935, showing liabilities in excess of $1,600,000, was introduced for the purpose of proving that the taxpayer in 1935 had ascertained the claim in question to be worthless.

In an antenuptial agreement which the taxpayer entered into in May 1, 1936, there was set up the Mainstone Farm Trust. The schedule of property affected by this trust included among his assets his claim of $38,875.70 against the Nathaniel Hamlen Trust. Schedule A of this agreement is entitled "Property Owned by Paul M. Hamlen to be Affected by the Foregoing Indenture and Antenuptial Agreement" and Item 14 there reads as follows: "Claim of Paul M. Hamlen against Paul M. Hamlen and Nathaniel Hamlen, as Trustees under the will of Nathaniel Hamlen, for money advanced to the said Trustees under the will of Nathaniel Hamlen in the principal amount of $42,875.70". The latter sum includes the claim in suit of $38,875.70.

At the conclusion of the testimony for the taxpayer, the trial judge ruled that the evidence was insufficient to warrant a verdict for the plaintiff and granted the defendant's motion for a directed verdict.

 We are of the opinion that there was a debt within the meaning of the statute. There are many meanings to such words as "debt" or "indebtedness", and their precise meaning in any given statute must depend upon the purpose of the statutory provision. Commissioner v. Tennessee Co., 3 Cir., 1940, 111 F.2d 678; cf. John H. Farish & Co. v. Commissioner, 8 Cir., 1929, 31 F.2d 79, 81, (bad debt deduction allowed for uncollectible amount embezzled from taxpayer). A debtor-creditor relation is possible even though the debt is between the trustee and his trust estate. The trustee has an enforceable right to reimbursement which is sometimes spoken of as an indebtedness. See, e. g., Austin v. Parker, 1925, 317 Ill. 348, 353, 148 N.E. 19, 22. ("An exception to this rule exists where the estate is either indebted to the trustee, or would be if he should pay the demand.") Though a partnership has no legal personality, it may be the debtor of one of its partners. Nye v. United States, 1 Cir., 1936, 84 F.2d 457, 462; Bowers v. New York Trust Co., 2 Cir., 1925, 9 F.2d 548, 550. Furthermore, Congress, in the income tax statute, has recognized the individuality of a trust or partnership by requiring separate returns to be filed by the trust and the trustee individually or the partnership and its partners. 26 U.S. C.A. Internal Revenue Code §§ 161–189.

 However, to be deductible as a bad debt, the debt must have existed in fact, for that which never existed had no value to lose. Appeal of Luke & Fleming, Inc., 1924, 1 B.T.A. 12. It has been held that when a taxpayer attempts to deduct as bad debts amounts which he has paid as endorser or guarantor and for which he has not been reimbursed, it must be shown that he was legally bound to pay as the voluntary assumption of obligations does not justify deductions. Jamie A. Bennett, 1939, 40 B.T.A. 744; cf. Robinson v. Commissioner, 8 Cir., 1931, 53 F.2d 810, 79 A. L.R. 975. But in the case of a trustee, it appears to be the law that he is entitled to reimbursement from the trust estate whenever he has benefited the latter by paying trust obligations out of his own pocket though he erroneously supposed himself to be liable. Restatement of Restitution, §§ 43, 54, 79; Scott, Trusts, (1940) § 245.1. Whether such a quasi-contractual claim for reimbursement, arising from a payment made under mistake of law, would, if uncollectible, give rise to a bad debt deduction, we need not now determine as we believe the trustee was under an enforceable obligation to make the payments to the Boston Safe Deposit & Trust Co. and the Warren Institution for Savings.

 The personal liability of the taxpayer for the payments made depends upon the law of Massachusetts. The mortgage note of October 17, 1930, given to the Warren Institution for Savings read in part as follows: "For Value Received, I, Paul M. Hamlen, as I am trustee under the will of Nathaniel Hamlen, * * * promise to pay * * * (signed) Paul M. Hamlen, Trustee as aforesaid". And the indenture of August 5, 1930, providing for an extension of the Stober mortgage and its assumption by the trustee was signed "Paul M. Hamlen, Trustee u/will Nathaniel Hamlen." After a searching examination of the authorities, we are convinced that under the law of Massachusetts the taxpayer was personally liable on these obligations and was entitled to reimbursement from the trust estate. Magallen v. Gomes, 1933, 281 Mass. 383, 183 N.E. 833; see Jump v. Sparling, 1914, 218 Mass. 324, 326, 105 N. E. 878, 879; Dunham v. Blood, 1911, 207 Mass. 512, 93 N.E. 804; cf. Hallett v. Moore, 1933, 282 Mass. 380, 185 N.E. 474, 91 A.L.R. 572; Carr v. Leahy, 1914, 217 Mass. 438, 105 N.E. 445. A trustee is personally liable on any contract unless he expressly contracts out of such liability. Magallen v. Gomes, supra; Carr v. Leahy, supra; Shoe & Leather National Bank v. Dix, 1877, 123 Mass. 148, 25 Am.Rep. 49; see, Scott, op. cit., at § 262. And the addition of the word "Trustee" and mention of the name of the trust is not sufficient to limit such liability. Carr v. Leahy, supra.

 However, it is suggested that Section 20 of the Uniform Negotiable Instruments Law, Mass.Gen.Laws (Ter.Ed.) c. 107, § 42, relieved the taxpayer of personal liability since he signed in a "representative capacity" and disclosed his "principal". Such is not the interpretation of the courts of Massachusetts. A trustee is not an agent, and represents and acts for no principal. Taylor v. Davis, 1884, 110 U.S. 330, 334, 335, 4 S.Ct. 147, 28 L.Ed. 163. Magallen v. Gomes, supra, held that a true trustee cannot sign in a "representative

capacity" within the meaning of the Negotiable Instruments Law and differentiated the cases where liability was explicitly modified or where the so-called trustees of a "Massachusetts Business Trust" are in reality agents and representatives of the certificate holders. See, e. g., Tebaldi Supply Co. v. MacMillan, 1935, 292 Mass. 384, 198 N.E. 651; Baker v. James, 1932, 280 Mass. 43, 181 N.E. 861. The Magallen case further held that the law "has not yet gone to the length of giving a quasi personality to all property held in trust, so that the signature as trustee to an instrument dealing with it demonstrates acceptance of a contractual relation to the property rather than with the trustee on the part of the holder of the instrument so signed."

It seems clear to us that since the taxpayer did not expressly negative personal liability on the mortgages given and assumed, he is personally liable under the laws of Massachusetts, and Section 20 of the Negotiable Instruments Law can have no application. See, Brannon, Negotiable Instruments Law (4th Ed. Chafee, 1926) 176. This whole subject has been admirably covered in a Note in 7 University of Cincinnati Law Review 288 (1933). We agree with the conclusion there reached and decide that by Massachusetts law this trustee was personally liable on the mortgage notes.

■ Since the taxpayer was legally obligated personally to repay the mortgage principal and interest both of the Stober mortgage, which he assumed as trustee, and personally guaranteed, and the mortgage to the Warren Institution for Savings, there is no ground for the argument that he was a mere volunteer. The debt is primarily that of the trust estate; and the trustee, if he pays such obligations from his own funds, has a right to be reimbursed from the assets of the trust estate. Scott, op. cit., at §§ 176, 248, 265.1. His obligation to pay arose when the mortgage notes were given or assumed, though the duty of the trust to reimburse him, the relation of debtor and creditor between the trust and him, did not arise until he made payment. The debt, then, did not arise until 1935; but the fact that it might have been worthless at the time the payment creating the debt was made cannot defeat the right of the taxpayer to his deduction since the binding obligation to pay had arisen long since when the trust was still solvent.

Shiman v. Commissioner, 2 Cir., 1932, 60 F.2d 65; cf. J. P. Badenhausen, 1927, 7 B.T.A. 910.

■ This personal liability negatives any suggestion that the payment was in the nature of a gift or a contribution to capital. There is not the slightest evidence that the taxpayer intended to make a gift, and there is every reason to believe that he expected to recover over from the trust. In 1930, at the beginning of the depression, when the taxpayer first became obligated on the mortgages, all the taxes and mortgage interest of the trust were paid and there was a substantial equity in the trust. He probably believed, as did many others, that the slump in real estate values was only temporary and that the best thing to do was to make such financial arrangements as he could to tide the trust over a difficult period. When he assumed these personal obligations he made no gift of them to the trust, but looked to the latter for reimbursement for what were in fact primary liabilities of the trust estate. At the time payment was made the trust became his debtor. Cf. Henry v. Burnet, 1931, 60 App.D.C. 90, 48 F.2d 459, affirming 1927, 8 B.T.A. 1089; Whitcher v. Welch, D.C.Mass.1938, 22 F.Supp. 763. There is no evidence of a donative intent nor that the trust was worthless when the obligations were assumed. Cf. H. Rodney Sharp, 1938, 38 B.T.A. 166. That latter fact completely distinguishes Dexter v. Commissioner, 1 Cir., 1938, 99 F.2d 769.

Neither can we accept the respondent's main contention that the payment by the taxpayer was a contribution to capital. Not every payment by a shareholder or beneficiary to protect his interest is such. In Daniel Gimbel, 1937, 36 B.T.A. 539, the Board of Tax Appeals held that the taxpayer, who with his three brothers were practically the sole stockholders of an investment trust, was entitled to deduct as a bad debt uncollectible claims against the trust which arose on payment by the taxpayer of his personal guarantees of the obligations of the trust. The Board said that at the time payment was made the taxpayer had no illusions about the condition of the trust and intended to make no new investments or to give any gifts. He paid only because he was obligated to do so. The taxpayer in the instant case was faced with the same situation. The payments made in reality represented loans to the trust, even though they also protected

the taxpayer's interest. Cf. Glendinning, McLeish & Co. v. Commissioner, 2 Cir., 1932, 61 F.2d 950; Walker v. Gulf & I. Ry. Co. of Texas, 5 Cir., 1921, 269 F. 885; H. R. MacMillan, 1929, 14 B.T.A. 1367. Most of the cases cited by the respondent may be distinguished on the ground that they were guarantees given in a situation connected with the acquisition of capital assets or a change in ownership, and any loss suffered can logically be considered an addition to the purchase price. See, e. g., United States v. Donaldson Realty Co., 8 Cir., 1939, 106 F.2d 509; Atlantic Coast Line R. R. v. Commissioner, 4 Cir., 1936, 81 F.2d 309; see, I.T.1904, III-1 C.B. 202.

It is our opinion that a trustee who is personally liable for the payment of mortgage notes of the trust, in the absence of an express disclaimer, is entitled to deduct as a bad debt a claim for reimbursement for such payment from the trust estate if it is ascertained to be worthless and charged off within the taxable year for which the deduction is sought.

We are also of the opinion that the debt was "charged off within the taxable year" within the meaning of the statute. The statutory language has been construed many times without legislative change to allow a deduction for bad debts physically charged off in the first months of the succeeding year as of the preceding taxable year. Kentucky Rock Asphalt Co. v. Helburn, D.C.W.D.Ky.1937, 20 F.Supp. 364; Rockwell Manufacturing Co., 1930, 19 B.T.A. 277; Zebulon Vance Pate, 1928, 13 B.T.A. 1236; Imperial Furniture Co., 1927, 9 B.T.A. 713; State Bank of Alcester, 1927, 8 B.T.A. 878; Mosher Manufacturing Co., 1927, 7 B.T.A. 187; George H. Fraser, 1927, 6 B.T.A. 997; Mason Machine Works Co., 1926, 3 B.T.A. 745; Berrymont Land Co. v. Davis Creek Land & Coal Co., 1931, 110 W.Va. 305, 158 S.E. 651; see, Cammack v. United States, 8 Cir., 1940, 113 F. 2d 547, 551; Malden Trust Co. v. Commissioner, 1 Cir., 1940, 110 F.2d 751, 752; American Cigarette & Cigar Co. v. Bowers, 2 Cir., 1937, 92 F.2d 596 (semble); Chicago Railway Equipment Co. v. Blair, 7 Cir., 1927, 20 F.2d 10 (semble). The decisions of the Board of Tax Appeals have, in the majority of cases, been specifically acquiesced in by the Commissioner; and in the light of this circumstance and the frequent repassage of the identical language in subsequent revenue acts, we believe the interpretation of the statute to be well established to include the instant case.

Ordinary business practice necessitates the allowance of a reasonable time after the close of the year for the auditing of the books and the physical notation of the closing entries of profit and loss. It is not the physical act done within the year to which Congress has referred, but to the setting up·of evidence as to the ascertainment of worthlessness substantially as of the date of such ascertainment and in confirmation thereof in order that such entries will effectually eliminate the amount of the bad debt from the book assets of the taxpayer. Commissioner v. MacDonald Engineering Co., 7 Cir., 1939, 102 F.2d 942, 945; Kentucky Rock Asphalt Co. v. Helburn, supra; Mason Machine Works Co., supra; see III Paul & Mertens, The Law of Federal Income Taxation (1934) § 28.30. In the instant case the entries were made to profit and loss in January or February, 1936, as of December 31, 1935. This is enough to bring the case within the law as construed. Cf. Coon Valley State·Bank, 1928, 13 B.T.A. 132; Ed. C. Lasater, 1925, 1 B.T.A. 956 (entries not made as of the taxable year).

We do not consider the case of Fairless v. Commissioner, 6 Cir., 1933, 67 F.2d 475, relied upon by the trial court, to be opposed to this view. In that case, there was no charge-off at all on the books prior to the filing of the income tax return in which the deduction was claimed, and there was no evidence of any investigation by the taxpayer into the alleged worthlessness of the accounts charged off. In such a situation it is quite clear that the deduction was not allowable. The circumstances at bar are materially different.

In order to ascertain a claim to be worthless, there is no set procedure. It depends on the circumstances in each particular case. The taxpayer, if bona fide, is the first judge of worthlessness, and it is not necessary for him to take unsuccessful legal action in order to sustain his claim. Selden v. Heiner, D.C.W.D.Pa.1926, 12 F. 2d 474. The taxpayer must make a reasonable investigation of the facts and must draw a reasonable inference from the information obtained. Sherman & Bryan v. Blair, 2 Cir., 1929, 35 F.2d 713. Though mere testimony as to general financial conditions is not enough to show worthlessness, depression conditions may make al-

lowable less specific information about the debt charged off. Higginbotham-Bailey-Logan Co., 1927, 8 B.T.A. 566, 579. The ascertainment of worthlessness must be the result of a sound business judgment, and "a remote hope of ultimate salvage is not sufficient to deny a deduction". American Warehouse Co., 1930, 19 B.T.A. 8, 11.

■ In the instant case, the taxpayer had all the relevant information before him since he was fully acquainted with the affairs of the trust estate. His affidavits, corroborated by expert testimony, tend to show that he knew the liabilities far exceeded the assets and that the latter were greatly overvalued on the trust books. The evidence tended to show that an unsecured creditor, assuming that the trustee's claim against the estate would qualify him to come in as such, would be likely to receive nothing before liquidation and only a nominal sum then. If, in the exercise of a sound business judgment, the trustee so decided, he ascertained the claim to be worthless within the meaning of the statute. Cf. Selden·v. Heiner, supra; Hammerschmidt & Franzen Co., 1928, 12 B.T.A. 811; Klau, Van Pietersom, Dunlap, Inc., 1928, 9 B.T.A. 1335; Imperial Furniture Co., supra; see, III Paul & Mertens, op. cit., at § 28.70. We believe a reasonable jury could find on the evidence that the taxpayer had ascertained the debt to be worthless.

■ The sole evidence introduced by the defendant to refute the taxpayer's claim that he ascertained the debt to be worthless was the inclusion of the claim as an asset in 1936 in listing the property of the trustee to be affected by the Mainstone Farm Trust set up in the antenuptial agreement. It is true that this is evidence that the taxpayer did not really consider the item worthless in 1935, but it is not necessarily conclusive. If the debt should in the future be paid, the taxpayer can certainly accept it though he must return it as income in the year received. Askin & Marine Co. v. Commissioner, 2 Cir., 1933, 66 F.2d 776. And the fact that a debt called worthless in one year later is found to be collectible does not destroy the previous ascertainment. American Trust Co. v. Commissioner, 9 Cir., 1929, 31 F.2d 47. It would be possible for a jury to find that the taxpayer simply turned over the claim to the trust with the idea that if it ever should become collectible the Mainstone Trust should receive it. The law seems satisfied if the taxpayer removes the item from his

balance sheet and ceases to use it as a book asset. Commissioner v. MacDonald Engineering Co., supra; Santa Monica Mountain Park Co. v. United States, 9 Cir., 1938, 99 F.2d 450, 455. Here the taxpayer charged the item to profit and loss on his books, and it does not appear to be the law that any evidentiary preservation of the obligation disproves an earlier ascertainment of worthlessness. Redfield v. Eaton, D.C. Conn.1931, 53 F.2d 693; Hammerschmidt & Franzen Co., supra.

■ It is our opinion that the claim of the taxpayer for reimbursement was a debt within the meaning of the income tax statute. We also believe that it was charged off within the taxable year in accordance with the law. Since we further hold that a reasonable jury could have found that the taxpayer ascertained the debt to be worthless, it follows that the trial court erred in directing a verdict for the defendant. The case must, therefore, be reversed and remanded for a new trial.

The judgment of the District Court is reversed, the verdict is set aside and the case is remanded to that court for further proceedings not inconsistent with this opinion.