*Decision will be entered under Rule 50.*

BRANDTJEN & KLUGE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66583. Filed June 7, 1960.

William R. Busch, Esq., for the petitioner.
Leonard A. Hammes, Jr., Esq., for the respondent.

418

419

426

430

434

OPINION.

TURNER, *Judge:* Under section 23(a)(1)(A) of the Internal Revenue Code of 1939 and section 162(a)(1) of the Internal Revenue Code of 1954, it is provided that deductions are to be allowed for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered."

The petitioner, on its returns for 1953, 1954, and 1955, claimed deductions of $13,532.24, $25,090.56, and $20,908.80, being the full amounts paid by it as compensation to Henry, Jr., in the said years as its secretary-treasurer. The respondent in his determinations herein allowed $3,750 of the amount claimed for 1953, $7,200 of the amount claimed for 1954, and $8,400 of the amount claimed for 1955, and disallowed as deductions the balances of the amounts claimed. The amounts allowed appear to be at the rate of $500 per month from May 16 to December 31 of the first year, $600 per month for the second year, and $700 per month for the third year.

By amendment to his answer, the respondent has now claimed that no deduction as compensation to Henry, Jr., is allowable for either of the years 1953 or 1954, and that the allowance for 1955 should be reduced from $8,400 to $4,350. His explanation of the amount now regarded by him as allowable for 1955 is that the per month rate is the same as originally allowed in his determination of deficiency, but that the amount allowed is now reduced to the compensation applicable to the period from June 16, 1955, to December 31, 1955, which represents the period after Henry, Jr., returned to work upon his discharge from the Army. In such circumstances, it would appear that the respondent in applying the rate to the period served has made a mathematical error of $200, and that at a rate of $700 per month for a period of 6½ months, the amount would be $4,550, rather than $4,350.

It is the position of the petitioner that it has submitted proof which fully supports the reasonableness of the compensation paid to Henry, Jr., during the years in question, and the presumption of correctness of the respondent's determination has thus disappeared. As will hereafter appear, however, our decision on this issue rests on the facts of record and not on any application of the doctrine of presumptive correctness of the respondent's determination.

For establishing its contention, the petitioner relies almost wholly upon the oral testimony of Henry, Jr., and upon numerous copies of letters which he testified were written by him in performance of his employment, together with the copies of some reports which also were prepared by him to reflect his views of petitioner's operations in certain geographical areas. Most of this testimony, in the judgment of the Court, was rather patently self-promoting, if not self-serving, the petitioner here being the corporation, and not Henry, Jr., himself. We listened attentively during the period he was on the witness stand and we observed him carefully during the course of his testimony, and we are completely satisfied that no one who heard him testify and who with reasonable objectivity considered his testimony in the light of other evidence and the record as a whole, could or would have reached any conclusion other than that his account of such services as he did perform and the substance and importance thereof was greatly inflated and grossly exaggerated. In short, in his assertions as to the time consumed by him in the doing of things in petitioner's behalf and the importance and effectiveness thereof in the operation of petitioner's business, he was neither persuasive nor impressive.

The facts show that, at intervals, Henry, Jr., had spent some time at petitioner's plant, had written some letters, for the approval of his father, and had possibly had some discussions relating to the business with his father and some of petitioner's personnel prior to May 19, 1953, when he was elected to the office of secretary-treasurer. When John had worked for petitioner prior to his election as secretary-treasurer he had been paid a modest salary, but whether the work of Henry, Jr., was not in substance comparable or whatever the reason, no compensation was allowed or paid to him for services prior to his election as secretary-treasurer. The facts further show that the election of John to the office of secretary-treasurer and later the election of Henry, Jr., to that position and the fixing of the compensation was not based upon any particular duties of the office or the duties which they were to perform, but primarily on the fact that Henry, Sr., during his incumbency as secretary-treasurer during the period his father had lived and was president of the petitioner, had received the same salary as his father, and he desired that the same be continued between him and his sons. There was no intention that upon their election they were to succeed to or take over the duties and responsibilities which had been those of Henry, Sr., while he had been secretary-treasurer. As for John, he was given some duties in the sales department and made some trips to Canada in connection with the operations of the Canadian subsidiary. As for Henry, Jr., the record shows that at the time he was named secretary-treasurer it was anticipated that very shortly thereafter he would

be called under the draft for service in the Army. In fact, Henry, Sr., had discussed the matter with Haugen, asking what the result would be if Junior should be elected to the office and received the voted salary while in the Army, and upon being told that deduction of the salary in whole or in part might be disallowed, resulting in an additional assessment of tax, with interest at 6 per cent, had said, "Well, if that's it, let's go ahead." The evidence further shows that after his election as secretary-treasurer on May 19, 1953, Henry, Jr., regularly reported to work at petitioner's offices and plant during the remainder of May, but after that until he was inducted into the Army on August 20, he was seldom at the plant. He requested the draft board for deferment on the grounds that he was managing the Brandtjen farms and was working for petitioner.

There were some periodic long-distance telephone conversations between Henry, Jr., and his father, and on periodic visits to St. Paul, Junior participated in some discussions and decisions relating to the conduct of the petitioner's business. There was also testimony by Junior and his father purporting to indicate that during the period of his Army service, and in addition to the performance of his duty as instructor in track vehicle maintenance at Aberdeen, and his participation in petitioner's operations, Henry, Jr., also made most, if not all, important decisions relating to the operation of the farms and their management. It was Henry, Jr.'s further testimony that he spent most of his time while on pass from Aberdeen in working in promotion of petitioner's business in the Washington, Baltimore, and Philadelphia areas.

Frankly, we were not impressed with either the importance of his efforts or the accomplishments, nor as to the ratable portion of his time on pass expended in matters relating to the petitioner's business. As to such time as he did spend with printers, we think one of his first statements from the witness stand, namely, that the visits had with printers in those areas was to "kill time," probably more nearly represents the truth. It could be, of course, that he did borrow from his time and efforts as a soldier while at Aberdeen. He did have at the time of his induction into the service a degree in mechanical engineering from the University of Minnesota. He was assigned to duty as an instructor in track vehicle maintenance, which it would seem reasonable to conclude would have provided a very good opportunity for the display and utilization of his capabilities and training as a mechanical engineer. It is to be noted, however, that it was not until some 2 weeks prior to his discharge that he attained the rank of corporal.

We are satisfied and convinced that the salary voted and paid to Henry, Jr., during the years here in question not only was not repre-

sentative of reasonable compensation for services actually rendered by him, but that it was not intended to be. The facts show that when John became secretary-treasurer he was frankly told that, even though voted the salary of the office, the salary was not to be his to do with as he pleased, but that, in the main, it was to be applied to carry the insurance which Henry, Sr., had set upon his life to provide the funds for satisfying the estate tax liability on his estate. After his election, John did not have any specified duties but, as indicated above, such duties as he did have were in the sales department, and while the monthly pay he was permitted to have for his own use was greater than it had been, it was still a comparatively small percentage of the salary of the office. Certain it is that the evidence supplies no basis for a conclusion that such services as Henry, Jr., did perform were of any greater importance than the duties John had been performing when he was elected to the office of secretary-treasurer, or those which John had continued to perform after such election and until he was placed on an absence without pay status by his father. Furthermore, we are satisfied on the evidence that at the end of May and for the remainder of the period preceding his induction into the Army, such work as he had been doing for petitioner was substantially discontinued.

We have not overlooked the testimony of both Henry, Sr., and Henry, Jr., tending to indicate that there were no such restrictions on Henry, Jr.'s right to receive payment of the compensation voted or of its use, such as had been the case with John. Be that as it may, however, the facts show that from the time of the assignments by Henry, Sr., in 1945 of certain of the insurance policies on his life to his wife and his two sons, Junior had been able to pay his share of the premiums only through gifts made to him, from time to time, for that purpose, allowance being made for the rent which he did receive on his farm and which was applied to the insurance payments.

The evidence further shows that after John's dismissal and he and his mother had assigned their interests in the insurance policies to Henry, Jr., that Henry, Jr., was thereafter able to pay the premiums on the policies through loans obtained largely from petitioner, and that the salary checks made payable to him as secretary-treasurer were deposited back to the account of the petitioner and applied on its books in satisfaction of loans or advances which had been made by petitioner for the purpose of meeting these insurance premiums. The evidence further shows that checks were regularly issued by Henry, Sr., to Henry, Jr., during the period of his service in the Army, for managing the farms. But as in the case of the salary checks issued by petitioner, the farm checks were likewise applied to the payment

of the insurance premiums, or used in repaying loans obtained from Henry, Sr., for insurance premium payments.

Based on the record as a whole, and considering the testimony of Henry, Jr., and that of Henry, Sr., in the light of other evidence, we are not even moderately persuaded that reasonable compensation for the services actually rendered by Henry, Jr., during the years 1953, 1954, and 1955 was even as much as was allowed by the respondent in his determination of the deficiencies herein. To the contrary, we think that the evidence convincingly shows that the respondent did in his determinations allow amounts greater than reasonable compensation for the services actually rendered.

The evidence does show, however, that Henry, Jr., did expend some time and effort in petitioner's behalf which he regarded as being of value, and we do not think that the respondent, by his proof, has shown that such services as were rendered by him at intervals during the period of his Army service were completely valueless and did not supply some basis for the payment of some compensation. He did, to use his own words, do some "snooping" around some printing establishments in Washington, Baltimore, and Philadelphia, and he did attend a meeting in Philadelphia and write a report thereon. He did make the trip to New York at the request of petitioner's attorney, although he was not called upon to do anything more. And having heard, in the course of his testimony, his own description of his doings for petitioner's account, we are satisfied that in his long-distance telephone conversations and on his trips to St. Paul there was at times some discussion of petitioner's affairs with his father. Taking into account the services performed by John while he was working for petitioner under the title of secretary-treasurer and the amount of compensation allowed to him therefor, and considering the work of Haugen and Barnes, two important and seasoned employees of petitioner, and the compensation paid to them, which patently was fixed at arm's length, and giving due consideration to the record as a whole, we are satisfied and convinced from the evidence that for 1953, reasonable compensation for the services rendered by Henry, Jr., and for which he was paid did not exceed $750; for 1954, did not exceed $1,200; and for 1955, did not exceed $5,100. The amounts in question have been arrived at as representing $100 per month for the period for which he was paid in 1953 and for 1954 and that part of 1955 up to his return to St. Paul, after his discharge from the Army. With respect to the remainder of 1955, the evidence, we think, fully justifies only the allowance of $700 per month.

To support its contention that deduction of the full salary paid Henry, Jr., was justified, the petitioner, on brief, makes much of the fact that a majority of the directors participating in the board meet-

ings at which the salary voted and paid to Henry, Jr., as secretary-treasurer were men who had no stock interests in the petitioner, and, on that basis, contends that the voting of the salary must be regarded as having been at arm's length. The argument, we think, merits little attention. At the time in question, Henry, Sr., controlled and ran the company. Abel Kluge may or may not have owned stock of petitioner, but, if so, his stockholding, insofar as control was concerned, was inconsequential. As for Barnes and Haugen, they were employees, subject to the will of Henry, Sr., and may not be regarded as independent participants. Haugen's employment, for instance, ended in 1956, when his resignation was requested, and at or about the same time Barnes' employment was terminated, whether of his own volition or by request.

The petitioner, on brief, also cites and relies on the decision of the Supreme Court of the United States in *Lucas* v. *Ox Fibre Brush Co.*, 282 U.S. 115, pointing out that prior to his election as secretary-treasurer, Henry, Jr., had done some work for petitioner for which he had received no compensation. It is pointed out that in *Lucas* v. *Ox Fibre Brush Co.*, the Supreme Court held that reasonable compensation voted and paid for past services is deductible from gross income for income tax purposes. Unlike the situation dealt with in that case, however, there was in this instance no voting of compensation for prior services, and that case is not in point, even if it be assumed that the prior services by Henry, Jr., would have merited some pay.

Having concluded as we have that Junior's election as secretary-treasurer of petitioner and the fixing of the amount of salary voted to him were based on considerations other than services which had been performed or were to be performed by him, *Ware Knitters, Inc.* v. *United States*, 168 F. Supp. 208, and *Berkshire Oil Co.*, 9 T.C. 903, cited and relied on by petitioner, are, in our opinion, distinguishable and not controlling, and that aside from the fact that those cases had to do with officers or employees absent in Government service during a period when the United States was actually at war.

With respect to bad debts, it is provided by section 166(a) of the Internal Revenue Code of 1954 that (1) "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year," and (2) that "[w]hen satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction." In section 166(c), it is provided that "[i]n lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts."

By section 1.166 of the Income Tax Regulations,[6] promulgated under section 166(a), *supra*, it is provided that a deduction "on account of partially worthless debts shall be allowed with respect to specific debts only," that in the case of a partially worthless debt, "the amount which has become worthless shall be allowed as a deduction under section 166(a)(2) but only to the extent charged off during the taxable year," and that "[b]efore a taxpayer may deduct a debt in part, he must be able to demonstrate to the satisfaction of the district director the amount thereof which is worthless and the part thereof which has been charged off."

Where, under section 166(c), *supra*, bad debts are accounted for by the reserve method, the deduction is in the form of an addition made at the end of a taxable year to a reserve to cover losses which it is anticipated will occur during the coming year by reason of worthlessness or partial worthlessness of accounts and notes receivable existing at the beginning of such coming year and of accounts and notes which will arise during the year. In the case of a taxpayer using the reserve method, the regulation, section 1.166–4(c), requires with the taxpayer's return a statement showing, among other things, the total amount of notes and accounts receivable at the beginning and close of the taxable year; the amount of debts which have become wholly or partially worthless and have been charged against the reserve account during the year; and the computation of the addition to the reserve. Stated otherwise, the deduction is the amount added to the reserve at the end of the year in anticipation of bad debt losses which will occur during the coming year. The deduction is not of specific debts which have become worthless in whole or in part and which, not to exceed the worthless portion, have been charged to the reserve during the year. Such charges against a bad debt reserve are of importance in arriving at the amount of the allowable bad debt deduction only because the amount by which the credit balance of the reserve has been reduced by the said charges may become a factor in arriving at the amount of the addition to be made to the reserve to provide for anticipated bad debt losses for the next year, which addition to the reserve, not the debts specifically charged, becomes the bad debt deduction on the return.

Neither the statute nor the regulations prescribe a particular method for making a chargeoff of a bad debt or a partially worthless debt from books of account. But, generally speaking, an effective chargeoff has been made if the entries relied upon have effectually

---

[6] While this regulation was not promulgated until July 31, 1959, it does not in any substantial respect vary the procedures and requirements for the deduction of a partially worthless debt from that prescribed by section 39.23(k)–1 of Regulations 118, promulgated under section 23(k) of the Internal Revenue Code of 1939.

eliminated the amount of the debt, or that part which is worthless, from the book assets of the taxpayer. See *Hamlen* v. *Welch*, 116 F. 2d 413, 419; *H. W. Findley*, 25 T. C. 311, affirmed per curiam 236 F. 2d 959.

In the instant case, the petitioner for the year 1954 deducted $28,000 as representing that to that extent its accounts receivable with its Canadian subsidiary were worthless in that year, and for 1955, $12,000 as being an added portion of the said accounts receivable which was worthless in 1955. Both deductions were disallowed by the respondent.

The respondent, in support of his determination, does not contend or suggest that the indebtedness in question was not bona fide, or not in the amount reflected by petitioner's books, it being his contention that the indebtedness has not been shown to have been worthless, as claimed by petitioner, and that there was no chargeoff of the said amounts of $28,000 for 1954 and $12,000 for 1955 within the meaning of the statute.

In the testimony of two of petitioner's witnesses, one a member of petitioner's bookkeeping staff and the other a member of the accounting firm which audited petitioner's books and who had been responsible for the preparation of petitioner's 1954 return, we have the stated conclusion that petitioner, in accounting for worthless debts, used the direct chargeoff method, and not the reserve method. The evidence relating to the accounts themselves and the method by which the claimed bad debt deductions were reflected on the income tax returns is not so definite or clear. The facts show that petitioner did, through the taxable years, carry on its books a ledger account entitled "Reserve for Doubtful Notes and Accounts," which account at the beginning and end of 1952, and up to December 31, 1953, had a credit balance of $70,000, and after that, a credit balance of $10,000, even though the ledger sheets for the years 1954 and 1955 and the income tax returns for 1952 and 1953 indicate that during those years there were no charges and no credits to the reserve, except a charge of $60,000, with a corresponding credit to earned surplus at December 31, 1953. It does appear likely, however, that the various receivables which were in comparatively small amounts and were deducted as worthless for the years 1954 and 1955, were charged off, or at least effectually eliminated from petitioner's book assets, since there is no indication in any of the accounts shown of record or in petitioner's balance sheets that they were carried to and reflected in any of the reserves carried on petitioner's books. On the other hand, the petitioner's income tax returns on their face stand in contradiction, in that Bad Debts Schedule F for each year listed for deduction no bad debts by the direct chargeoff method, but to the contrary, explained

the bad debt deductions claimed by entries in the schedule for use "If Corporation Carries a Reserve," listing the amount of the bad debt deduction claimed as the amount added to the reserve and an identical amount as having been charged against the reserve.

While there is no indication of the use or maintenance of a reserve by petitioner on its books in accounting for miscellaneous bad debts, and there is the indication, as outlined above, that miscellaneous bad debts were in fact cleared from petitioner's book assets, the same may not be said with respect to the $28,000 in 1954 and the $12,000 in 1955 claimed as deductions on the returns for those years as representing the partial worthlessness of petitioner's accounts receivable with its Canadian subsidiary. No chargeoff was in fact made of the $28,000 in 1954, nor of the $12,000 in 1955, but by adjusting journal entries prepared by its auditors, petitioner carried the said amounts as credits to a new ledger account entitled "Reserve for Loss on B & K Canada," and the only method which suggests itself for the elimination in fact of the said amounts from petitioner's book assets would be by crediting the accounts receivable account and charging the reserve account, as in the case of the usual chargeoff of partial worthlessness where bad debts are accounted for by the reserve method. It is, to say the least, difficult to see that there has been a chargeoff where the entry made does not in fact eliminate any amount from the asset account itself, but, to the contrary, is a credit entry to a reserve, which term itself implies the setting up of a fund to absorb a loss which it is anticipated will in all likelihood occur in the future.

It is a fact, however, that the book entries here made, however they may have been described or limited, were related or restricted to one specific indebtedness, as the regulation requires. It is also true, as petitioner points out, the net result, for balance sheet purposes, is the same as if a direct chargeoff had been made from the asset account. On the other hand, the same statement could be made as to the balance sheet net result of any amount credited to a regularly established reserve for anticipated losses in accounts receivable generally. There are, however, these differences. In this instance the evidence indicates that the basis for the action taken was that there actually was an existing partial worthlessness of the accounts receivable with the Canadian subsidiary at least equal to the amount sought to be deducted for each year, and the purpose sought to be accomplished was an allowable deduction for partial worthlessness for each year. It is also true that the title of the new account, even though designated a reserve, was in the terms of a loss which had in fact been incurred by reason of existing partial worthlessness, and not of an anticipated future loss. On this basis, it is the contention of the petitioner that under sound accounting principles there was in

fact an effective chargeoff, namely, that the credit to the new reserve account, limited as it was to the receivables from the one debtor, should be read as if it were a credit to the receivables account itself. In support of this position, petitioner relies on the opinion testimony of the accountant who had supervision of the 1954 audit of its books and the preparation of its 1954 income tax return. In the light of the apparent contradiction between the opinions expressed in the course of his testimony and the form of the Bad Debts Schedule F of the 1954 return, it may be observed that the logic of petitioner's argument is much more persuasive than the opinion testimony of the man responsible for the setting up of the account in the manner shown and for the return itself.

While the question is not free from doubt, and the accounting forms indulged in appear at first blush to point in the other direction, we are disposed to accept what was done as an effective chargeoff for the purposes of the deductions claimed. The entries were definitely limited to the one account. They were intended to accomplish the purpose contended for, and were described in words indicating a sustained loss, and not an anticipated future loss, in the one specific account. In these respects, the situation here is distinguishable from that which existed in *International Proprietaries, Inc.*, 18 T. C. 133, where a contra conclusion was reached. We accordingly hold that the entries made in petitioner's accounts, on the facts in this case, satisfied the statutory requirement of a chargeoff.

There remains the question of existing partial worthlessness in each of the years in an amount at least equal to the amount charged off. As we have already noted, the respondent does not contend that the indebtedness was not bona fide, and the evidence shows petitioner had charged the subsidiary for merchandise at the same discount from its f.o.b. St. Paul prices as had been the case with the Canadian dealer in prior years. The facts also show that the Canadian subsidiary dealt in petitioner's products exclusively and that the volume of business had steadily deteriorated. And whether by better planning and management the losing venture could ultimately become a profitable one, we are satisfied, on the evidence, that in the years in question the receivables were in fact worthless to the extent claimed. On the partially worthless debt issue, we accordingly hold for the petitioner.

There remains, however, the question of the deduction of $5,000 as representing the worthlessness of petitioner's capital stock investment in Brandtjen & Kluge (Canada), Ltd. Unlike the partially worthless debt, the deduction for worthless stock falls in the year the stock became worthless. At least generally, it is reasonable to conclude that worthlessness of corporate stock precedes the worthlessness

of a corporate debt, since a credit liability has priority over liability for investment capital. See *Estate of James N. Gamble*, 32 B.T.A. 892. Certain it is that if the stock in the instant case was worthless in 1954, there is no showing that it was not worthless in a prior year. The respondent's disallowance of the claimed deduction is accordingly sustained.

When petitioner acquired its old building in 1928, it estimated its remaining useful life as 25 years, and thereafter computed its depreciation deduction for each year on that basis, taking into account no amount as salvage value of the property at the end of the 25-year period. At the beginning of 1953, which was the 25th year after the building had been acquired, the undepreciated cost or other basis, as shown by petitioner's books, was $2,298.17, and that amount was deducted on the 1953 return as the depreciation on the building for that year. The respondent, in his determination of deficiency, determined that the salvage value of the building was in excess of the undepreciated cost of $2,298.17, and disallowed the deduction claimed.

The facts show that although the building was anything but modern, was in many respects in poor condition, and was no longer suited for housing petitioner's heavier operating machinery, it was nevertheless still in substantially full use by the petitioner and continued to be so used through all of the years herein, and at the time of the trial had been in use some 30 years.

It is the contention of the petitioner that in claiming a flat rate depreciation covering the entire cost basis of the property on a 25-year basis, the effect was a determination that the building, when acquired, had a zero salvage basis; that the respondent not having made any changes in the depreciation deductions so claimed for prior years, and not having determined at the beginning of 1953, the year in question, or at the beginning of some prior year, that the useful life of the building was greater than 25 years, he is barred from questioning the depreciation deduction claimed for 1953, the 25th year. And as we understand it, the position of the petitioner is the same whether the old building at January 1, 1953, did or did not have a salvage value equal to the amount of its then undepreciated cost.

As provided by section 23(1) of the Internal Revenue Code of 1939, the depreciation deduction allowable for 1953 is "[a] reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business." In section 39.23(1)–1 of Regulations 118, relating to the depreciation deduction allowable, it is provided that "[t]he proper allowance for such depreciation is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amount so set aside, plus the salvage value, will, at

the end of the useful life of depreciable property, equal the cost or other basis of the property." In section 39.23(1)-4, it is provided that "[t]he capital sum to be replaced by the depreciation allowances is the cost or other basis of the other property in respect of which the allowance is made." In section 39.23(1)-5, it is provided that "[t]he reasonableness of any claim for depreciation shall be determined upon the conditions known to exist at the end of the period for which the return is made. If the cost or other basis of the property has been recovered through depreciation or other allowances no further deduction for depreciation shall be allowed. The deduction for depreciation in respect of any depreciable property for any taxable year shall be limited to such ratable amount as may reasonably be considered necessary to recover during the remaining useful life of the property the unrecovered cost or other basis. The burden of proof will rest upon the taxpayer to sustain the deduction claimed."

From the above regulations, it is thus apparent that when the depreciation allowance, plus the salvage value at the end of the useful life of the depreciable property, is such as to return to the taxpayer its cost or other basis for the said property, no further allowances therefor may be had. In the instant case, the petitioner prior to 1953 had deducted the entire cost or other basis for its old property, except $2,298.17. The respondent in his determination of deficiency determined that the salvage value in the building at the end of its useful life was in excess of $2,298.17, which was the entire amount of the undepreciated cost at the beginning of the taxable year, and that such being the case, no further deduction under section 23(1) was allowable.

While the petitioner has introduced evidence to show that the old building was not in good shape, and that undoubtedly its useful life was drawing to a close, it has offered no proof directed to the existence or nonexistence of the building's salvage value, the burden of proving which was clearly its own. To allow the deduction claimed, in the face of respondent's determination and without proof that his determination of salvage value was erroneous, would be to approve a recovery as depreciation of an amount in excess of petitioner's cost or other basis for the old building, which under the statute and the regulations thereunder may not be done.

On brief, the petitioner directs a substantial part of its argument to section 1.167(a)-1(c) of the Income Tax Regulations, to the effect that "[s]alvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. However, if there is a redetermination of useful life under the rules of paragraph (b) of this section, salvage value may be redetermined based upon facts known at the time of

such redetermination of useful life." It is to be noted, however, that the regulation referred to was promulgated under section 167 of the 1954 Code, which section and the regulations thereunder are applicable to taxable years ending after December 31, 1953. The tax year here involved is 1953.

Petitioner's claim for the 1953 depreciation deduction on its old building is not well founded, and is denied.

The respondent in his determination of petitioner's net loss carryback from 1955 determined that petitioner had failed to report $5,500 representing interest which had accrued in 1955 on loans by petitioner to Henry, Sr., its president. At the time the loans were made, Henry, Sr., had signed two notes on forms used by petitioner with its customers, which forms contained provisions for 6 per cent interest per annum. Although these forms were regularly used when on occasions petitioner made loans to its officers and employees, it was petitioner's established and unvaried practice to charge no interest on such loans. In keeping with that policy, it neither accrued on its books nor collected from Henry, Sr., any interest on the loans made to him in February of 1955. That such was petitioner's settled practice with respect to loans to officers and employees was shown by the testimony of Haugen, a former employee of petitioner, who had been in charge of petitioner's books for many years, but who in 1956 had resigned his position by request.

It appearing that there was never any intention that Henry, Sr., would be liable for interest on the notes, that this intention was in keeping with settled and unvaried practices of petitioner, and that no interest was in fact accrued on petitioner's books as a charge against Henry, Sr., and no interest was collected from or paid by him on the loans, we conclude and hold that the respondent erred in his determination with respect thereto. *Wilbur Security Co.*, 31 T. C. 938; *Society Brand Clothes, Inc.*, 18 T. C. 304; *Combs Lumber Co.*, 41 B.T.A. 339.

*Decision will be entered under Rule 50.*