**VELVET O'DONNELL CORPORATION**

v.

**The UNITED STATES.**

No. 432–79T.

United States Claims Court.

Feb. 25, 1983.

Wallace H. Glendening, Jaffe, Snider, Raitt, Garratt & Heuer, Detroit, Mich., with whom was David J. Lieberman, Southfield, Mich., of counsel, for plaintiff.

Wallace B. Barker, Washington, D.C., with whom was Asst. Atty. Gen., Glenn L. Archer, Jr., Washington, D.C., for defendant.

OPINION

COLAIANNI, Judge:

This case of first impression is before the court on defendant's motion for partial summary judgment. Generally, the question presented is the effect of Treas.Reg. § 1.1502–14(d)(1), T.D. 6909, 1967–1, C.B. 240, on a taxpayer's entitlement to a bad debt deduction. Particularly at issue is whether a loss due to the partial worthlessness of the debt of another corporation is, under consolidated return regulations, an allowable deduction on the consolidated return in the year of affiliation where the companies became affiliated after the bad debt was determined partially worthless and its charge-off authorized by resolution of plaintiff's board of directors, but before the charge-off was reflected on the company's books at year's end.

After consideration of the pleadings, briefs and attached exhibits, and following oral argument by the parties, it is concluded, for reasons which are fully explained hereinbelow, that § 1.1502–14(d)(1) does not require plaintiff to defer its deduction for partially worthless debts. Defendant's motion for summary judgment is accordingly denied.

The issue framed by the motion is solely one of law, and its disposition is governed by Rule 56 of the Rules of the United States Claims Court. The facts pertinent to this issue are not in dispute, and are summarized below.

*Facts*

Plaintiff in this case is Velvet O'Donnell Corporation (Velvet), a Michigan corporation. Plaintiff filed a consolidated tax return on October 28, 1972, the end of its fiscal year, on behalf of itself and two subsidiaries, O'Donnell Importing Company and Haberstroh Farm Products, Inc. (Haberstroh). This return included a deduction for partially worthless bad debts in the amount of $675,000 from loans made by Velvet to Haberstroh before the date of their affiliation. The company also took a deduction for $50,000, which reflected the purchase price of a loan obligation from Haberstroh to E.E. Dale Shaffer, Chairman of the Board of Haberstroh, and owner of 89.25 percent of its stock. Velvet's loans to Haberstroh began in November 1971, and by July 1, 1972, it had advanced the company a total of $936,000. During this period, Velvet did not own any of the stock of Haberstroh.

As of July 8, 1972, for reasons which do not appear in the record, the Board of Directors of Velvet O'Donnell Corporation decided that approximately $675,000 of the debt owed to the company by Haberstroh was worthless. Minutes of a special meeting of Velvet's board, dated Saturday, July 8, 1972, reflect that a resolution of the board was passed that date authorizing a charge-off of $675,000 on the books and records of Velvet, to reflect the company's loss from its loans to Haberstroh. The resolution further authorized the charge-off of $50,000, an amount representing the cost of a "purchase note" of Haberstroh in the principal amount of $1,998,937.09. The note evidenced part of Haberstroh's indebtedness to Shaffer, its principal shareholder. The board resolution concluded by directing the appropriate officers of Velvet to take whatever action was necessary to carry out the board's directive.

The only manifestation of the board action on Velvet's books and records, however, was a journal entry, made by plaintiff's accountants on October 28, 1972, the last day of Velvet's fiscal year, crediting its loans receivable account in the amount of the charge-offs. The loans made by Velvet to Haberstroh, as well as the charge-off, were corporate acts which took place within Velvet's 1972 fiscal year but prior to the acquisition of Haberstroh by Velvet.

The government, for the purposes of its summary judgment motion, does not contest the validity of either the advances made to Haberstroh, or the determination of partial worthlessness of these debts within the year. They also allow that the partially worthless portion of the loans were properly charged off as of October 28, 1972, the date the journal entries were made.

On July 22, 1972, two weeks after the charge-offs, Velvet purchased 89 percent of the stock of Haberstroh. It subsequently filed a consolidated corporate tax return for its fiscal year ending October 28, 1972, for itself and O'Donnell Importing Company, a wholly-owned subsidiary of Velvet, and for Haberstroh. The consolidated return included Haberstroh's post-affiliation income. In addition, Haberstroh filed a separate return, covering the period from January 1, 1972, the beginning of its fiscal year, to July 21, 1972, the day prior to its affiliation with Velvet, for its pre-affiliation activity.

Plaintiff seeks a refund of $281,110 in taxes for the year ending October 28, 1972, and for $56,016 in taxes for the tax year ending November 1, 1969, based on a net operating loss carryback from 1972 due to the bad debt deduction.

*Discussion*

Section 1501 of the Internal Revenue Code of 1954 (26 U.S.C.)[1] provides for the

---

1. All statutory references are to the Internal Revenue Code of 1954, as amended. Section 1501 reads as follows:

*Privilege to file consolidated returns.*

An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated

filing of consolidated income tax returns by affiliated groups of corporations,[2] subject to certain provisions, if the members of the affiliated group so elect. The filing of a consolidated return is considered a privilege, and is conditioned upon the consent by the members of the group to be bound by the regulations governing consolidated returns provided for under § 1502 of the Code.[3]

Treas.Reg. § 1.1502–14(d) is the regulation in controversy in the instant case. It provides, in pertinent part:

(1) *Deferral of gain or loss.* To the extent gain or loss is recognized under the Code to a member during a consolidated return year because of a sale or other disposition * * * *of an obligation of another member* (referred to in this paragraph as the "debtor member"), whether

return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such consent. In the case of a corporation which is a member of the affiliated group for a fractional part of the year, the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group.

**2.** Treas.Reg. § 1.1504(a), T.D. 6500, 25 Fed. Reg. 12106 (1960), provides as follows:

(a) Definition of "Affiliated Group".—As used in this chapter, the term "affiliated group" means one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation if—

(1) Stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of each of the includible corporations (except the common parent corporation) is owned directly by one or more of the other includible corporations; and

(2) The common parent corporation owns directly stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of at least one of the other includible corporations.

**3.** I.R.C. § 1502.

**4.** Treas.Reg. § 1.1502–1, T.D. 6894, 1966–2 C.B. 364, defines certain terms relevant to this discussion as follows:

or not such obligation is evidenced by a security, such gain or loss shall be deferred. For purposes of this paragraph, a deduction because of the worthlessness of * * * an obligation described in this subparagraph shall be considered a loss from the disposition of such obligation. [Emphasis added.]

The provision requires the deferral in a consolidated return year of gains and losses resulting from the disposition "of an obligation of another member" of the affiliated group.[4] Subsumed in the main question to be decided in the instant case is whether plaintiff must defer the loss in its 1972 consolidated return resulting from its declaration of partial worthlessness of the debt owed it by Haberstroh until one of the events described in the regulations[5] triggers the restoration of the deduction.

*Definitions.*

(a) *Group.* The term "group" means an affiliated group of corporations as defined in section 1504. See § 1.1502–75(d) as to when a group remains in existence.

(b) *Member.* The term "member" means a corporation (including the common parent) which is included within such group.

(c) *Subsidiary.* The term "subsidiary" means a corporation other than the common parent which is a member of such group.

(d) *Consolidated return year.* The term "consolidated return year" means a taxable year for which a consolidated return is filed or required to be filed by such group.

(e) *Separate return year.* The term "separate return year" means a taxable year of a corporation for which it files a separate return or for which it joins in the filing of a consolidated return by another group.

**5.** Treas.Reg. § 1.1502–14(d) describes the restoration events as follows:

(2) *Restoration of gain or loss where obligation leaves group.* If an obligation described in subparagraph (1) of this paragraph is sold or disposed of to a nonmember (or if the member holding the obligation becomes a nonmember), each member with deferred gain or loss with respect to such obligation under subparagraph (1) of this paragraph shall, except as provided in subparagraph (3) of this paragraph, take such gain or loss into account ratably over the remaining term of the obligation.

(3) *Restoration of gain or loss on other events.* Each member's gain or loss deferred with respect to an obligation under subparagraphs (1) which has not been taken into account under subparagraph (2) of this para-

Plaintiff argues that since Velvet's board charged off the bad debt by corporate resolution on July 8, 1972, which is before its July 22, 1972, acquisition of Haberstroh, the letter and spirit of § 1.1502–14(d)(1) has not been violated because Haberstroh had no obligation at the time it became a member of the Velvet group. Velvet points out that, while the deduction was taken in a year which included Haberstroh in the consolidated return, it did not include that part of Haberstroh's fiscal year during which the events at issue took place. Rather, those events took place during a time prior to the acquisition for which Haberstroh filed a separate return.

Defendant maintains that the bad debt charge-off did not occur until it was mechanically recorded on the books and records of the company at year's end, and that Haberstroh was a member of the affiliated group at this time. Defendant further argues that it does not matter when the charge-off was made because the regulations require deferral of the deduction if the debtor corporation is a member of the consolidated group in the consolidated year in which the deduction is claimed.

The question then comes down to whether the regulation includes only those debtor companies whose obligations resulted in a loss to another member during a time that the companies are affiliated or whether it means to encompass companies which, regardless of the timing of the loss, became affiliated at any point during the lender company's fiscal year.

Before passing the regulation, it is necessary to answer a threshold question to determine when the loss to the member corporation holding the obligation during the consolidated return year can be considered to have been "recognized," within the meaning of the regulation. A decision that the date of recognition was the date of the journal entry would dispose of the question of deferral in favor of the Government since there is no argument that Haberstroh was a member of the affiliated group as of the end of the fiscal year. However, the question of recognition is not clear cut.

A deduction due to the worthlessness of an obligation of another member is considered as a loss from the disposition of that obligation for the purposes of the regulation, and this loss is to be deferred under Treas.Reg. § 1.1502–14(d). If recognition is triggered by the deduction because of worthlessness, it is imperative to determine precisely when that disposition occurred. Plaintiff's argument that the proper date of recognition is the date the debt was charged off by the board and its worthlessness evidenced by corporate resolution is, I find, the more persuasive under these circumstances.

In examining this issue, two observations are made at the outset. First, defendant has not questioned the validity of the board's conclusion of worthlessness, so it may be accepted that part of the assets held by Velvet in fact had no value prior to the date of affiliation of the companies. Second, in passing the resolution and directing that its action be reflected on the company's books and records, Velvet's board formally represented that the company no longer possessed assets in the amount of the charge-off. Had Velvet represented its assets to the outside world as of the date of affiliation, it could not have included the value of the notes receivable from Haberstroh.

As defendant points out in its motion, the statute governing partially worthless debts [6] does not describe the manner in which a charge-off is to be affected. Defendant cites 5 J. Mertens, *Law of Federal*

graph shall be taken into account immediately before the occurrence of the earliest of the following events:

    (i) When such member ceases to be a member,

    (ii) When the stock of the debtor member (or any successor in an acquisition to which section 381(a) applies) is considered to be disposed of by any member under § 1.1502–19(b)(2) (other than subdivision (ii) thereof), or

    (iii) When the obligation is redeemed or cancelled.

6. I.R.C. § 166(a)(2).

*Income Taxation,* § 30.18 (1980), as well as the case of *Brandtjen & Kluge, Inc. v. Commissioner,* 34 T.C. 416, 441–42 (1960), for the proposition that generally "a charge-off is effectuated in the case of a taxpayer who maintains books and records, by effectively eliminating the worthless portion of the debt from assets on the taxpayer's books and records." That a charge-off on a company's books and records is evidence of the determination of worthlessness is not disputed here. However, while a charge-off on a company's books may be the general way to evidence worthlessness, it is not the only way.

In *Brandtjen & Kluge, Inc. v. Commissioner, supra,* the court was reviewing a bad debt deduction from a post-year-end perspective to determine if any action had been taken to evidence the worthlessness (or continuing vitality) of a debt, "within the taxable year" under I.R.C. § 166(a)(2). Typically, the court is looking at the company's actions as of the end of the fiscal year to see if a charge-off was made within the year. However, the question in this case is not whether the charge-off occurred "within the year." That is not in dispute, and a post-year examination of Velvet's books and records would indeed reflect this fact. The question, rather, is whether the worthlessness was determined at a particular point in time within that year. For this reason, the use of the mechanical recordation test to decide whether worthlessness was recognized by the end of a fiscal year is inadequate. Clearly, any entries intended to represent corporate activity during a fiscal year will appear as of the last day of that year. But we cannot infer from the absence of these entries before the end of the fiscal year that the state of facts which such mechanical entries represent do not exist. To do so in this case would completely ignore the substance of the board action in declaring Haberstroh's debt worthless, and would apparently make its determination effective only upon entry in the books of the company.

Despite defendant's reliance on the wording of the resolution to support its contention that the board "merely directed that the charge-off be made on taxpayer's books and records," it concedes the worthlessness of the debt. If the board's determination was valid, it must have been valid as of the time it was made. The debt either was or was not worthless as of July 8, 1972, and since defendant has conceded that the debt was in fact worthless, it may not "post-date" that determination.

Defendant would have the court treat the bad debt deduction as a determination which should be made after considering all the facts and circumstances as of the end of the year. The government argues that to evaluate the bad debt before the end of the year is contrary to accepted practice which requires that an entire year's activity be taken into account. Delaying a determination of worthlessness, the defendant argues, avoids premature resolutions that do not take into account subsequent events which may make the debt valuable again. However, in this situation it is impossible to treat the debt as if nothing out of the ordinary transpired between the time the debt was declared worthless in July and the end of the fiscal year when the deduction was taken. In fact, during this time Haberstroh was not only sold, but it was sold to plaintiff. Velvet purchased the remaining assets of Haberstroh for whatever value they possessed at the time. The relationship between Velvet and Haberstroh became one of parent and subsidiary and these two entities elected to file a consolidated return. Based on these facts, it must be concluded that the change in the relationship between Haberstroh and plaintiff was significant enough to require that the status of the debt be considered and evaluated as of the time of the affiliation. The question at issue of necessity focuses on the treatment which ought to be given the bad debt deduction in the context of the consolidated return of Velvet and Haberstroh, and this simply cannot be done without looking at the relationship of the companies as well as the economic substance of the board's action at the time that the events of affiliation occurred.

Courts have not unswervingly bound themselves to the formality of recordation as evidence of the worthlessness of a bad debt, but have at times looked to the substance of the events in deciding if a write-off has occurred. In fact, our court's predecessor has held board action to be sufficient recognition of worthlessness even where there has been no deduction on the books and records at year's end. *First State Bank of Stafford,* 67 Ct.Cl. 332, 335 (1929). I conclude that the substance of the tax event must be looked to in interpreting § 1.1502–14(d)(1), and, therefore, that the date the board declared the debt worthless, and not the date the journal entry was made is the date upon which the loss was recognized. Since this occurred prior to the affiliation of Velvet and Haberstroh, deferral is not necessary.

While defendant disagrees with plaintiff regarding the date of the recognition of the loss, it contends that the date does not really matter since under the regulations and the facts of this case, plaintiff is not entitled to a deduction under any circumstances. The Government maintains that § 1.1502–14(d) prevents the charge-off even if it is made in the period prior to affiliation as long as the debtor is a member of the group during the consolidated return year in which the deduction is claimed. On this point, I also disagree with defendant.

The lack of prior interpretation of the regulation, as well as the unusual fact situation in this case, makes the application of the regulation a tangled thicket.

Defendant's argument in favor of deferral is based on the fact that the taxpaying entity as of the end of the consolidated tax year is a group which includes not only Velvet and its subsidiary, O'Donnell International, Inc., but also Haberstroh, whose debt is reflected as a deduction on the consolidated return. Defendant points out that, even though the loan and the charge-off would have taken place before the acquisition, the deduction would be an element of the return which represented not only Velvet's transactions during the period

which included the loan and the charge-off, but also Haberstroh's after July 22, 1972. Since Haberstroh was a member of the consolidated group filing the return, the deduction, defendant argues, represented the disposition of an obligation of a then-member, which § 1.1502–14(d)(1) requires to be deferred.

Plaintiff argues that all transactions of the affiliated parent prior to acquisition of the subsidiary should be considered segregated just as the acquired company's preaffiliation income and expenses are segregated from the group with the filing of a separated return for its taxable year ending on the day prior to affiliation.[7] Further, Velvet states that the words of the regulation speak only to members of the group affiliated at the time of the transactions involved, and that Velvet and Haberstroh thus did not come under the regulations. Finally, plaintiff asserts that its reading of the regulation is consistent with the purpose of the regulations governing consolidated returns and their deferral requirements.

In construing Treas.Reg. § 1.1501–14(d), it is useful to keep in mind the purpose behind the consolidated return, and the goal to be achieved in deferring gains and losses of other members of the affiliated group. "The basic principle of the consolidated return is that the group is taxed upon its consolidated taxable income, representing principally the results of dealings with the outside world after the elimination of intercompany profit and loss." B. Bittker and J. Eustice, *Federal Income Taxation of Corporations and Shareholders,* ¶ 15.20 (4th ed. 1979). Additionally, under the broad authority delegated pursuant to § 1502 of the Code, the Secretary is directed to—

> [P]rescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed,

---

7. *See supra,* n. 4.

assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

I.R.C. § 1502.

It is with the above principles in mind that the regulations, including the restoration provisions, should be examined. I have concluded that the regulation could not have meant to include pre-affiliation loss within its scope. Several reasons support this conclusion. I begin with the regulation itself.

In looking at the wording of the regulation, two points immediately come to mind. First, the regulation speaks of recognition during a consolidated return year. As shown above, in this instance, the recognition of worthlessness was made by plaintiff before the time of consolidation. Thus, Velvet did not recognize the loss during the consolidated return year. Second, the regulation speaks of a "debtor member." While Haberstroh was a debtor at one point and a member at another, at no point in time was it both a debtor and a member.[8] These facts alone may be dispositive of defendant's argument.

Although the wording of the regulation is hardly a model of clarity, it is only necessary to look to the remainder of the regulations pertaining to the restoration events for support of the above interpretation of § 1.1502.14(d)(1).[9] It appears that in each case the restoration events contemplate a situation where the subsidiary was part of the affiliated group from the beginning of the fiscal year. This, of course, is not the situation in this instance, since Haberstroh was not a member of the group at the time that the debt was charged off.

Defendant contended, at the oral argument, that the possibility of double deductions exists if Velvet is allowed to prevail

and that this is the evil at which the regulation is directed. Defendant apparently feels that the future depreciation by the group of assets originally purchased by the funds which have now been declared a bad debt will result in a double deduction in favor of plaintiff. I disagree with defendant's conclusion. In the first place, the problem of double deductions is not cured by deferral of deduction. If the bad debt deduction is deferred and taken at a later time, there is still a double deduction. The question in such a case would be, rather, how to effect an elimination of that double deduction. This question has been addressed by the courts in other contexts and I think that duplication can be eliminated in a manner as set forth by the courts in these analogous situations. See AMBAC Industries, Inc. v. Commissioner, 487 F.2d 463, 467 (2d Cir.1973).

However, I disagree with defendant that there is a double deduction potential in such circumstances as we have presented here for the more fundamental reason that defendant has not shown that the value of the debt which became worthless is in any way represented in any depreciable assets.[10] At oral argument defendant stated that plaintiff purchased Haberstroh for one dollar. Defendant suggested from this that the debt owed to Velvet entered into the sale of the company. However, the defendant has not challenged the validity of the bad debt. Defendant's double deduction argument is thus not understood since it has not shown that the depreciation of any of Haberstroh's assets entered into the consolidated return.

One further point deserves underscoring. Defendant argues that although a debtor may find a debt to be worthless and writes it off on its books, that debt does not automatically disappear as a legal obligation of the debtor and may be sued on. This may be generally true when the lender is dealing with an unrelated debtor corporation.

---

8. As explained, infra, upon the purchase of Haberstroh by Velvet, the partial bad debt was cancelled.

9. See, supra, n. 5.

10. Defendant has not fully explained how it can accept the validity of the bad debt on the one hand, and yet allege that assets attributed to the bad debt remain to be depreciated.

However, a different result occurs in a situation such as the one at bar where the lender (plaintiff) acquired 89 percent of the debtor's assets. In this latter situation a suit by the lender would be tantamount to suing itself. Under these circumstances, it would appear that the debt was cancelled by the acquisition. In addition, the possibility of the debt becoming valuable again becomes a moot issue where all subsequent income of the subsidiary is consolidated with lender's pursuant to the regulations governing post-affiliation consolidated income.

Finally, to require, under the facts of this case, that Velvet defer the taking of its partial bad debt does not serve to accomplish the intended goals of the regulation. As set out in § 1502, the regulation was intended to foster a clear reflection of the income tax liability of the affiliated corporation and each member and, as well, to prevent the avoidance of the tax liability.

Velvet did not acquire Haberstroh for its tax attributes. The right to a bad debt deduction had vested with Velvet before acquisition of Haberstroh. Instead, plaintiff runs the risk to the extent defendant prevails, of being forced to defer the taking of a deduction by its acquisition of Haberstroh. While it is clear that the taxpayer takes the consequences of electing a particular form of filing,[11] the fact that deferral of its bad debt might result shows that the acquisition was not done for the purpose of avoiding liability subsequent to the charge-off. It is true, as defendant freely admitted at oral argument, that Velvet could have avoided this pitfall by simply delaying the purchase of Haberstroh until after plaintiff's new fiscal year, i.e., after October 28, 1982. However, to require this would be in essence to say that Velvet needed to contrive, not to avoid a tax obligation, but rather to preserve a legitimate current deduction which had already vested with it. Under the facts of this case, an interpretation of the regulation requiring such a course of action appears undesirable.

Inasmuch as the "outside world" was concerned, the transactions which included the loans, the charge-off, and the subsequent purchase of Haberstroh by Velvet were those of unrelated entities dealing at arm's length. The fact that these later became affiliated, in the absence of any suggestion of a tax avoidance scheme, does not recast those transactions into dealings between affiliated companies. I do not find that there is a furthering of the purpose of the regulations by deferring the deduction under these circumstances, but to the contrary, feel that a deferral might lead to distorted results upon the restoration of the deduction. Defendant has shown nothing to support a conclusion that such a deduction would open a floodgate of "trafficking" in such losses or any other type of abuse. I therefore conclude that the regulation does not require the deferral of debts of members who were not affiliated during the existence of the obligation.

## CONCLUSION

For reasons explained hereinabove, it is ordered that defendant's motion for summary judgment is denied. Counsel for defendant is directed in the event that the case cannot be amiably resolved, to file its submission to the court's standard pretrial order by April 26, 1983. Plaintiff will have 30 days after the filing of defendant's submission in which to file its reply.

11. *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974); *Blitzer v. United States,* 231 Ct.Cl. ——, 684 F.2d 874, 887 (1982).